**Brett HARTMAN, Petitioner,**

v.

**Margaret BAGLEY, Warden, Respondent.**

No. 1:02–CV–1336.

United States District Court, N.D. Ohio, Eastern Division.

Aug. 31, 2004.

---

J. Joseph Bodine, Jr., Office of the Attorney General, State of Ohio, Corrections Litigation Section, Columbus, OH, John B. Gibbons, John F. McCaffrey, McLaughlin & McCaffrey, Cleveland, OH, for Brett Hartman, Petitioner.

Daniel R. Ranke, Office of the Attorney General, State of Ohio, Capital Crimes Section, Cleveland, OH, for Margaret Bagley, Respondent.

## OPINION

GWIN, District Judge.

On January 16, 2003, Petitioner Brett Hartman ("Hartman") petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Hartman, an inmate in the custody of the Mansfield Correctional Institution of Ohio and under a sentence of death seeks this writ, saying that both his conviction and his sentence violate the United States Constitution.

Because the Court concludes that Hartman's claims are without merit, the Court DENIES Hartman's petition.

## I. BACKGROUND

On April 14, 1998, a Summit County, Ohio jury convicted Petitioner Brett Hartman of aggravated murder with an aggravated circumstance specification of kidnapping. The jury also found Hartman guilty of tampering with evidence and kidnapping. On May 18, 1998, the jury sat for a mitigation hearing and, on that same day, recommended a death sentence. On May 22, 1998, the Summit County trial court sentenced Hartman to death. After exhausting his direct appeals and state post-conviction remedies, Hartman seeks a writ of habeas corpus in federal court pursuant to 28 U.S.C. § 2254.

## A. FACTS

The Ohio Supreme Court's opinion in *State v. Hartman*, 93 Ohio St.3d 274, 754 N.E.2d 1150 (2001), described the factual background of the murder that underlays this case:

> Defendant met Winda Snipes at a bar in Akron, Ohio, sometime during 1997. Subsequently, they engaged in sexual intercourse on several occasions. During the late afternoon of September 9, 1997, defendant went to Snipes's apartment and brutally murdered her by tying her to the bed, stabbing her one hundred thirty-eight times, slitting her throat, and cutting off her hands.

> Defendant was convicted of aggravated murder, kidnapping, and tampering with evidence, and sentenced to death. In order to establish defendant's guilt, the state introduced statements defendant

had made to the police and to a fellow inmate in jail, and the testimony of a co-worker that defendant mentioned cutting off a victim's hands as a way to eliminate evidence in the O.J. Simpson case. The state also introduced as evidence defendant's bloody tee-shirt and Snipes's watch recovered from defendant's apartment, and forensic testimony linking defendant to the murder.

State's case

Around 2:20 a.m. on September 9, 1997, defendant met Snipes at the Bucket Shop, an Akron bar. Defendant kissed Snipes on the cheek and they talked. Thereafter, defendant and Snipes left the bar and they went to her apartment across the street.

Around 3:00 a.m., David Morris, an acquaintance of defendant and Snipes, left the Inn Between, another Akron bar. While walking past Snipes's apartment on his way home, Morris observed Snipes and defendant through the upstairs window of her apartment. Morris testified that Snipes was yelling at defendant about touching stuff that was not his. Defendant closed the window blinds and "obviously she wasn't very happy about it" because she "scolded" him and reopened the blinds.

That afternoon, at around 4:30 p.m., Snipes was observed crossing a street in a nearby business district. She was never seen alive again.

Defendant had the day off from work on September 9. According to Richard Russell, a bartender at the Inn Between, defendant entered the bar at around 8:00 p.m. and appeared nervous and hyper, and talked excessively. Thereafter, defendant was in and out of the bar five to six times between 9:00 and 10:30 p.m. Defendant first contacted the police on September 9 with a series of anonymous 911 calls, which he later admitted to.

His first 911 call at 9:59 p.m. reported the location of a mutilated body. The police officers dispatched to Snipes's address entered Snipes's apartment building and checked around, but left after finding nothing unusual. Meanwhile, defendant viewed the police unit's arrival and departure while hiding behind a tree across the street. Defendant then made another 911 call telling the police to return to the apartment building and provided further instructions on the body's location.

Akron police officers responding to this call entered Snipes's unlocked apartment and found her naked, mutilated body lying on the bedroom floor. Snipes's leg was draped across the bed, a pair of pantyhose tied her ankle to the bed leg, and a white plastic chair was on top of her body. Snipes's hands were cut off and have never been found.

Around 10:45 p.m., defendant was at the Inn Between with Morris, while police units were across the street investigating Snipes's murder. Morris, having learned that Snipes had been murdered, suggested to defendant that he should talk to the police, since Morris had observed defendant at Snipes's apartment the previous evening.

Shortly before midnight, defendant approached Detective Gregory Harrison while he was at a mobile crime lab parked outside Snipes's apartment. Defendant walked up to Harrison and said, "I hear it's pretty bad in there," and asked if Harrison had "ever seen anything so gruesome." Later that evening, defendant approached Harrison a second time and spontaneously mentioned that Snipes was a whore, "that she slept around a lot," and that "he had slept with her and he had even slept with her the night before at 3:00." In their final contact at around 3:00 a.m.,

defendant was "kind of mumbling to himself" and Harrison heard defendant say that "she was a whore, she was a big whore, she got what she deserved."

Between 11:30 p.m. and 12:15 a.m., defendant also approached Akron Police Lt. John A. Lawson near the murder scene and, "rather abruptly said, 'You're going to find my semen in her and my prints over there.'" When Lawson asked why, defendant said he "had been with her earlier that morning, the morning of the 9th," and that he had sex with her.

At 12:15 a.m. on September 10, defendant spoke to Detective Joseph Urbank in front of the apartment building. Defendant began their conversation by announcing that "he had sex with the victim the night before." Moreover, defendant said he did not know her name but "only knew her as psycho bitch and that everybody knew that if you got drunk and were horny you went to go see her, you went to go see psycho bitch."

Defendant also told Urbank that he went to Snipes's apartment at 2:30 a.m. on September 9, and "she started dancing a little bit." He "lifted her onto the bed, undressed her," and "they started having vaginal intercourse." Defendant said that he was disappointed because Snipes refused to have anal intercourse, and he left her apartment around 3:30 a.m. However, defendant claimed that he did not know anything about the murder until the bartender at the Inn Between told him about it on the evening of September 9.

Around 6:00 a.m. on September 10, police took defendant to the Akron police station, where he was interviewed by Lawson and Urbank. During his interview, defendant denied making the 911 calls, and denied hiding behind a tree

across from Snipes's apartment. Then, defendant changed a part of his story and admitted hiding behind a tree near the murder scene.

Following the September 10 police interview, the police searched defendant's apartment with his consent. The police seized defendant's bloody tee-shirt from underneath the headboard of his bed, a pair of his jeans, and his boots. Police found a knife on his dresser and Snipes's wristwatch on defendant's bed stand.

Police took defendant to the police station after the search of his apartment. While awaiting transfer to the Summit County Jail, defendant approached Detective John R. Gilbride and blurted out, "I was the one that called the police" and "I'm the one that found the body."

Defendant told Gilbride he had been sexually involved with Snipes since February 1997, and had sexual intercourse with Snipes during the early morning hours of September 9. Defendant stated that "after having sex the psycho bitch threw him out of the apartment stating that her boyfriend was coming over." He left around 3:30 a.m. and returned to his own apartment.

According to Gilbride, defendant said that he slept until 6:00 p.m. on September 9, and then took the bus to the Inn Between bar around 7:30 p.m. Gilbride testified that while going into the Inn Between bar, defendant noticed a light on in Snipes's apartment and decided to visit her. According to Gilbride, defendant gained entry to the apartment through an unlocked door and claimed that he found her dead body in her bedroom. Defendant said that he unsuccessfully tried to pick her body off the floor, noticed that her hands had been cut off, and "freaked out." Thinking "I'm going to get busted for this," defendant washed her blood off his

hands and clothes, tried wiping down everything he touched, removed evidence linking him to her apartment, and went home.

Snipes was stabbed one hundred thirty-eight times. Bruising on her ankles indicated that she was alive when she was tied to the bed. Additionally, sperm was found in her vagina and anus. The medical examiner concluded that Snipes had died from strangulation and a slit throat either in the late afternoon or early evening of September 9.

Police found defendant's bloody fingerprint on the leg of the white chair draped over Snipes's body, and police found another of defendant's fingerprints on Snipes's bedspread. An expert witness testified that the long linear blood patterns found on defendant's tee-shirt and Snipes's bedspread were applied by a long-bladed knife. Further, the blood patterns found on defendant's tee-shirt were applied while the tee-shirt was lying flat, and not while defendant was wearing it.

At trial, the prosecution introduced a set of defendant's knives, including a meat cleaver, a knife, and a knife sharpener that defendant kept at the Quaker Square Hilton, where he worked as a chef.

Christopher Hoffman, a Hilton co-worker, testified that he talked to defendant in August 1997 about the O.J. Simpson trial. According to Hoffman, defendant said that Simpson could have disposed of evidence against him by cutting off the victim's hands and eliminating "fibers and hair and skin that might be found on the fingernails."

Bryan Tyson, a fellow inmate at the Summit County Jail, testified that during a jailhouse conversation, defendant admitted that he had killed Snipes. According to Tyson, defendant said that

"he pushed himself on her, something in his mind snapped, she was hitting him, he lost his temper, did things he regretted, killed her." Then, defendant said that he had "tried to make it look like a burglary," admitted cutting off Snipes's hands, and mentioned a hacksaw, and jokingly said " 'Don't leave home without it,' like the credit card commercial."

Defense case

Jessica O'Neill, an acquaintance of defendant, talked on the phone with defendant on September 9. Phone records showed that O'Neill called defendant's apartment and spoke with him at 3:12 p.m. and 4:50 p.m. She also claimed that she talked with defendant on the phone around 6:30 or 7:00 p.m.

The defense also introduced evidence suggesting an alternative suspect, Jeff Nichols. Mr. Nichols lived across the hallway from Snipes's apartment until he moved out of his apartment around September 1, 1997. Nichols worked as a handyman for the apartment building and had access to the landlord's keys to other apartments.

In January 1997, Jeffrey Barnes, a friend of Snipes, was visiting Snipes's apartment when Nichols came to her door. According to Barnes, Nichols "got up right to her door and then he said, 'Slit the bitch's throat, cut her up,' and called her a slut and all other kind of vulgar names." Barnes reported this incident to the police upon hearing about Snipes's murder.

On an evening prior to September 1, 1997, Linda Zarski, a neighbor in Snipes's apartment building, heard Snipes pounding on Nichols's door and screaming that she wanted her shirt.

On another occasion prior to the murder, Linda Kinebrew, a neighbor living at the apartment, "heard [Nichols] argu-

ing, telling [Snipes] to let him in and she wouldn't."

Carol Parcell, defendant's mother, provided an alibi. Defendant lived at his mother's apartment, and Parcell claimed that when she came home on September 9 at 6:15 p.m., her son was sleeping in his bedroom. According to Parcell, defendant woke up at 7:00 p.m., got ready, left the apartment at 7:30 p.m., and returned to the apartment around 8:15 p.m.

Defendant testified on his own behalf. He admitted having sex with Snipes several times over the past year and during the early morning hours of September 9 when he was at Snipes's apartment. After having sex, defendant returned to his apartment at about 3:30 a.m., slept until 6:15 p.m., left his apartment at 7:35 p.m., and returned to the Inn Between bar. Before reaching the Inn Between, defendant noticed that Snipes's bathroom light was on at her apartment, and he decided to visit her to see if he could "get laid." Defendant entered Snipes's apartment through an unlocked door and found her mutilated body in the bedroom. Defendant tried to "get her up and put her on the bed to see if there was anything else I could help with." Defendant "freaked out" after noticing Snipes had no hands and realized he "could get in a lot of trouble" if he was placed at the scene. Thus, he washed her blood off his hands, wiped down the cupboards, chair handles, and anything else he might have touched, gathered whatever items he could find that belonged to him, and left Snipes's apartment. Defendant "ran home" and threw the items taken from Snipes's apartment into a nearby dumpster. Upon arriving home, defendant changed his shoes and hid the bloody tee-shirt so that his mother would not find it.

Thereafter, defendant hurried back to the Inn Between bar and started drinking. When he was "semi-intoxicated," defendant made the anonymous 911 calls reporting the location of Snipes's body, admitted standing behind a tree watching the police arrive at Snipes's apartment, and later approached the police to report that he had been at the apartment the previous evening.

Defendant introduced photographs taken of his naked body following his arrest to show the absence of bruises and injuries. Defendant explained that a cut on his elbow had occurred at work while he was moving crates.

Defendant acknowledged talking with Chris Hoffman about the O.J. Simpson case but did not recall discussing anything about cutting off a victim's hands. Defendant knew Tyson as a fellow inmate but denied making any jailhouse admissions that he murdered Snipes.

*Id.* at 1158–1161.

## B. TRIAL PROCEEDING

In a two-count indictment, the Summit County Grand Jury indicted Petitioner Brett Hartman on September 16, 1997. Count One of the indictment charged Hartman with Aggravated Murder under Ohio Rev.Code § 2921.12(A). Count One did not carry a death penalty specification. Count Two charged Petitioner with Tampering With Evidence under Ohio Rev. Code § 2921.12(A)(1).

On October 16, 1997, the state of Ohio filed a superceding indictment with two additional offenses. Count Three, which carried a death penalty specification under Ohio Rev.Code § 2929.04(A)(7), charged Petitioner with Aggravated Murder under Ohio Rev.Code § 2903.01(B). Count Four, (incorrectly identified in the superceding indictment as count two), charged Petitioner with the kidnapping of Ms. Snipes, vio-

lating Ohio Rev.Code § 2905.01(A). Ultimately, the jury would find Hartman guilty on all counts and specifications as charged in the superceding indictment.

On April 14, 1998, the trial began. During voir dire, the trial court asked nearly every juror whether he or she had read or heard about the homicide before reporting for jury duty. The trial court attempted to prompt the jurors' memories by describing the victim as having her "hands chopped off" and a murder that was "bloody and gruesome." Defense counsel did not object to the use of these descriptions and phrases during the voir dire.

As will be discussed in an assignment of constitutional violation, during voir dire Juror Enders revealed that her daughter-in-law had previously served on an out-of-state jury that had acquitted a defendant of a murder charge. In the out-of-state trial involving her daughter-in-law, the victim's family then harassed several jurors following the not-guilty verdict by writing on their cars and making phone calls. Juror Enders stated that the incident remained on her mind. However, she maintained that she did not think the incident would intimidate her from following the law in the Hartman case. Hartman's trial counsel did not question other prospective jurors regarding the experience of Juror Enders' daughter-in-law to learn if the story negatively affected those jurors. Hartman's trial counsel did not challenge Juror Enders.

The following week, on April 21, 1998, the guilt phase of the trial began. The State produced twenty-four witnesses. The Court summarizes the relevant portions of the testimony below:

Kathryn Snipes–Gaskey, the victim's sister, took the stand and testified at length about the victim's character, background, and close family relationships. Ms. Snipes–Gaskey identified and described, in detail, a photo collage of the victim and her family displayed at the funeral. Ms. Snipes–Gaskey referred to photos that showed the victim's "last Christmas at home." Ms. Snipes–Gaskey also testified that the victim's parents and grandparents received letters from Winda Snipes that she had written before, but that were not delivered until after, her death.

Brigid Berrodin, a bartender and manager of the Bucket Shop, testified that Hartman came into the bar around 2:30 a.m. on the morning of September 9, 1997. Berrodin testified that Hartman walked up to Ms. Snipes, gave her a kiss on the cheek, and talked to her. Ms. Berrodin recounted that Hartman and Ms. Snipes left through the back door to the alley while discussing their plans to get some beer.

Next, the State called David Lessem, the owner of Summit Tailoring in Highland Square. Mr. Lessem knew Ms. Snipes from the neighborhood. Mr. Lessem testified that, on Tuesday, September 9, 1997, he saw Ms. Snipes in front of his store at 4:30 p.m. Lessem recalled that this was the exact time because he listens to the financial news at the same time every day. Richard Russell, a bartender at the Inn Between, testified next. Mr. Russell resides directly behind the Inn Between on 25 South Highland Street. Witness Russell recounted that, around midnight, September 9, 1997, Hartman asked if Russell knew where he could get some drugs. In response, Russell said that he did not. Within the same conversation, Witness Russell recounted that Hartman "said that he was going to fuck her [Ms. Snipes]." After the bar closed, Russell related that Hartman exited through the back door. Later, Russell recounted that he saw a dark figure through a window of Ms. Snipes apartment and heard loud music coming from the apartment. Witness Rus-

sell testified that, the following day, Tuesday, September 9, 1997 around 8:00 p.m., Hartman returned to the Inn Between bar and was acting "more hyper than usual." Russell attested that he saw Hartman leave the bar about five or six times that night anywhere between 9:00 and 11:00 p.m. Russell also testified that Hartman said that he was going to talk to the police because he was at Ms. Snipes' apartment the previous night.

Adam Walker, a parts manager at a local BMW dealership, testified next. Witness Walker testified that he called 9–1–1 to notify the police that he had observed a figure, which fit Hartman's description, hiding behind a tree watching the police investigation.

The State then called David Morris, a patron at the bar the night of September 8, 1997. Morris testified that he saw Hartman through Ms. Snipes' window around 3:00 a.m. on September 9, 1997. He further testified that he had heard music coming from Ms. Snipes' apartment and that he overheard Snipes scolding Hartman not to touch things that did not belong to him. Witness Morris also testified that the following night he mentioned to Hartman that he had seen him in the Ms. Snipes' apartment window in the early hours of September 9. Morris attested that Hartman confirmed that he was in Ms. Snipes' apartment.

Susan Kamvouris, an employee of the Akron Police Fire and Safety Communications Office, then testified. Kamvouris testified that the 9–1–1 emergency line had received four calls on September 9, 1997, relating to Ms. Snipes. She testified that the first call, a hang-up, was received at 9:57 P.M. from a payphone outside the Walgreens Drug Store at Portage Path and Market Street. Witness Kamvouris further testified that, in response to the hang-up call, the call taker attempted to call back the payphone, but it did not accept incoming phone calls. Kamvouris then testified that the call taker called the Walgreens and asked the clerk to see if anyone needed assistance at the payphone and to describe anyone at the phone. Kamvouris testified that the Walgreens clerk described a black male standing near the pay phone wearing jeans and a white tee-shirt. Witness Kamvouris testified that the second 9–1–1 call, which spoke of a mutilated body, was received at 9:59 P.M. from the same pay phone outside the Walgreens. Kamvouris also testified that, at 10:19 P.M., the Communications Office received a 9–1–1 call from Adam Walker. Kamvouris gave testimony that they received the fourth and final 9–1–1 call at 10:45 P.M. from the Highland Square Theater pay phone.

Two Akron police officers who responded to the 9–1–1 calls also took the stand. Officers Laura Jean Natko and Drew Kelly testified that they discovered Ms. Snipes' body at her 21 South Highland apartment. They testified that they first went to 21 South Highland and knocked on various apartment doors, including Ms. Snipes' door, before leaving. After initially not discovering anything suspicious at 21 South Highland, they went to investigate 21 North Highland. Upon only finding an abandoned building at this location, they returned to 21 South Highland and did a more thorough investigation. They testified that on their second trip to Ms. Snipes' apartment, they heard music coming from inside Snipes' apartment and that her door was closed, but unlocked. They further testified that after finding the body, Officer Kelly searched a nearby dumpster and found a bag containing beer bottles and a letter addressed to Ms. Snipes.

The State then called Gregory Harrison, a detective in the Identification Crime Lab

Unit. Detective Harrison testified that Hartman approached him while he was working on processing evidence in the Mobile Crime Lab. Harrison testified that Hartman told him that he had slept with Ms. Snipes the night before and had been with her at 3:00 A.M. In response to their conversation, Detective Harrison directed Hartman to go speak with Detective Urbank. Harrison also testified to the various evidence that they recovered from the crime scene. He stated that the alarm clock with its cord cut off had stopped at 4:40 p.m. Detective Harrison testified that the time of death would have been at approximately the same time the clock stopped. Harrison also testified that he discovered a set of keys to Ms. Snipes' apartment in a nearby dumpster with a bag filled with beer bottles, ashes, and cigarette butts.

John Gilbridge of the City of Akron's Narcotics Bureau was the next witness to testify. Officer Gilbridge testified that Hartman spoke to him and admitted that he had found Ms. Snipes' body and that Hartman admitted going back to wipe down the apartment so his finger prints would not be found. He further testified that Hartman admitted removing the beer bottles, cigarettes, ashes, and keys to the apartment and disposing of them in the dumpster behind the apartment. Officer Gilbridge further testified that Hartman stated that he had locked the door to Ms. Snipes' apartment when he left.

Subsequently, Paul Hlynsky of the Akron Police Department took the stand. Officer Hlynsky testified that he had searched Hartman's apartment with Hartman's consent and a valid search warrant. While searching the apartment, Hlynsky testified that he heard Hartman say to his mother that "They will probably strap me to an electric chair for this one." (Trial Tr. 1224).

The State also called John Callahan, a sergeant in the Akron Police Department's Detective Bureau. Sergeant Callahan testified that he participated in the search of Hartman's apartment and that he had seized a pair of black Levis that Hartman was wearing the night he was at Ms. Snipes' apartment. Sergeant Callahan also seized Winda Snipes' watch, found on the bed stand in Hartman's bedroom.

The State then called Larry White of the Akron Police Department. Officer White testified that in the in the course of the investigation he went to Hartman's place of work, the Quaker Hilton Hotel, to search for Ms. Snipes' hands in the refrigeration equipment. While searching the Quaker Hilton Hotel, Officer White testified that Hartman's supervisor, John Kocevar, turned over Hartman's cutlery set which contained four knives. White also testified that upon his investigation of Ms. Snipes' employer, he discovered that she had picked up her pay check at approximately 1:30 p.m., on September 9, 1997.

James Wurster, a forensic scientist of the Ohio Bureau of Criminal Identification and Investigation assigned to the DNA section, testified next. Wurster testified to the various blood and tissue tests he conducted on evidence. Forensic Scientist Wurster testified that there was a small drop of blood on Hartman's right boot, but law enforcement did not test this blood to learn if it was human blood. Wurster also found that the black Levis tested negative for the presence of blood. The knives seized were also found negative for any blood or tissue. Forensic Scientist Wurster stated that blood was found on the white tee-shirt seized from Hartman's apartment. Wurster further testified that he did not conduct DNA testing on the limited sample of semen found in Ms. Snipes. He also stated that police did not

give him the condom recovered from Ms. Snipes' apartment, nor was he told if the victim had used a condom with Hartman.[1]

Next, Cynthia Mayle of the Bureau of Criminal Identification and Investigation took the stand. Criminologist Mayle testified that she identified a latent palm print found on the plastic lawn chair as Hartman's print. Ms. Mayle also testified that she examined the alarm clock with a magnifying glass that morning and had determined from that examination that the prints on the alarm clock had insufficient ridge detail to make a positive match.

The State then called Patrick Warrick, a latent print examiner for the King County Sheriff, in Seattle, Washington. Warrick testified that he could identify a right thumb print on the bedspread as Hartman's with the use of digital enhancement equipment. Finger Print Expert Warrick also admitted in his testimony that this was the first time that he had testified with the aid of digital enhancement equipment.

Doctor Marvin Platt, the medical examiner for Summit County, testified at length to the nature of Ms. Snipes' injuries. He found her manner of death to be homicide and her cause of death to be from an incision to the neck and by strangulation by use of the alarm clock cord. He further testified that Ms. Snipes had sex before her death, but that there was no evidence that the sex was forced. Dr. Platt also testified that he found the presence of sperm in her vagina and anal cavity. He explained that sperm heads and tails could be present in the body for 18–20 hours after sex suggesting that the likely perpetrator had deposited the sperm in the late afternoon.[2]

Christopher Hoffman, a line cook and prep person who worked with Hartman at The Depot at the Quaker Square Hilton, took the stand next. Hoffman testified that sometime in late August 1997 he initiated a conversation with Hartman regarding the O.J. Simpson murder trial. He testified that Hartman suggested that cutting off a victim's hands would eliminate the chance of the police finding DNA or fibers underneath the nails.

The State then called Rod Englert, a forensic consultant who specializes in crime scene reconstruction. Englert testified that his blood pattern analysis illustrated that the blood patterns on the white tee-shirt were transfer patterns consistent with a long-blade knife.

John A. Lawson, a lieutenant in the Akron Police Department, testified next. Lieutenant Lawson testified that Hartman approached him and told Lawson that "you're going to find my semen in her and my prints over there." (Trial Tr. 1535). Lawson also testified that Hartman came down to the station for further investigation where Lieutenant Lawson questioned him regarding the 9–1–1 calls. Hartman admitted that he had found the body and made the 9–1–1 calls. Lawson further testified that he had participated in the search of Hartman's apartment and during that search that he discovered a bloody shirt behind Hartman's bed.

The State also called William R. Smith, from the Akron Police Department Detective Bureau. Detective Smith testified that he recovered from Ms. Snipes' apartment clothing, two checkbooks, and the garbage disposal so that they could test it for human tissue or blood.

1. A victim assistance employee had discovered a condom in Ms. Snipes' trash can.

2. Coroner Platt examined the body on September 11, 1997 beginning at approximately 11:00 a.m.

The State then called Bryan Tyson, a prior inmate from the Summit County Jail. Tyson testified that he had a brief conversation with Hartman in the smoking room of the Summit County Jail. Inmate Tyson testified that during this conversation Hartman admitted he had murdered Snipes.

Joseph Urbank of the Akron Police Department Detective Bureau was the last witness for the State. Detective Urbank testified that he participated in the investigation and took crime scene photographs and did some neighborhood canvassing. He further testified that he spoke with Hartman and during this conversation Hartman detailed his encounter with Ms. Snipes from the previous night. Detective Urbank also testified that he talked to Jeff Nichols and searched his apartment. Urbank further testified that he requested cab records from 9:00 p.m., on September 9, 1997 to 1:00 A.M., on September 10, 1997 to learn if Nichols traveled to or from the Highland Square area.[3]

Detective Urbank also testified regarding the incoming and outgoing calls from Hartman's telephone. He gave testimony that on September 9, 1997, someone made two outgoing calls from Hartman's home telephone. The caller made the first call at 2:47 p.m. to Jessica O'Neill's pager number and made the second outgoing call at 2:57 p.m. to Jessica O'Neill's home telephone (O'Neill is Hartman's friend). Detective Urbank further testified that Hartman's home telephone received six incoming telephone calls, on September 9, 1997. The first incoming call was received at 8:02 a.m. from Jessica O'Neill. Hartman received the fourth incoming call at 3:12 p.m. from Jessica O'Neill, and it

lasted approximately twenty-four minutes. The sixth incoming call was received at 4:50 p.m. from Jessica O'Neill's home and lasted for three minutes and thirty-nine seconds. After the presentation of these twenty-four witnesses, the State rested.

The Defense produced eight witnesses. In presenting this evidence, Petitioner Hartman gave evidence of an alibi—that he was at his home at the likely time of the killing. Hartman also gave evidence suggesting that a former neighbor of Ms. Snipes may have committed the murder. The Court summarizes the relevant portions of their testimony below.

Hartman first called Kimberly H. Cherry, the 9-1-1 operator who worked the night of September 9, 1997. Operator Cherry testified that she received four 9-1-1 calls and that a black male was identified near the pay phone where the first two calls were made.

The Defense called Jessica O'Neill, Hartman's friend who worked with him at Quaker Square. O'Neill testified that she called Hartman at 3:12 p.m. on September 9, 1997 and spoke with him for approximately twenty-five minutes. She also testified that she spoke with him again at 4:50 p.m. and that she had woken him up from a nap. She further testified that nothing was out of the ordinary about Hartman when she spoke with him on those two occasions.

Next, Diane Cramer, the personnel and payroll manager at the Quaker Square Hilton Hotel, took the stand. Personnel Manager Cramer testified that the Quaker Square Hilton fired Hoffman on October 9, 1997, for job abandonment.

**3.** Mr. Urbank did not offer any explanation as to why he chose to request records for these particular time parameters, when this choice of time frame did not include the time of

death or the time immediately preceding or following it. The records requested began over four hours after the approximate time of Ms. Snipes' death.

In the defense's attempt to attribute Snipes' murder to a neighbor of hers, Linda Kinebrew, one of Snipes' neighbors at 21 South Highland, testified that Nichols lived in the apartment across from Ms. Snipes until a week before the murder. Neighbor Kinebrew testified that Jeff Nichols had access to all of the apartments because he worked for the landlord doing handy work inside the apartments. Kinebrew also testified that she had overheard Victim Snipes and Jeff Nichols arguing before the murder. Neighbor Kinebrew testified that Nichols was upset with Ms. Snipes because she would not let him into her apartment.

Defendant Hartman then called Jeffrey Barnes, an old boyfriend and friend of Victim Snipes. Barnes testified that once when he was at Snipes' apartment in January 1997, Jeff Nichols came to the apartment door yelling and banging on the door. Former Boyfriend Barnes testified that during this incident Jeff Nichols yelled that he was going to "slit the bitch's throat, cut her up." He further testified that he did not know Nichols personally, only though what Winda Snipes had told him.

Next, Linda Zarski, a resident of 21 South Highland, testified that Jeff Nichols told her that he and Winda Snipes had a platonic relationship. Zarski further testified that on one particular night, before Jeff Nichols moved out of the apartment building, she overheard Winda Snipes screaming and pounding on Nichols' door, yelling that she wanted her shirt.

Petitioner Hartman then called Carol Parcell, Hartman's mother. Ms. Parcell testified that she called Hartman twice on September 9, 1997. She also testified that she arrived home from work on September 9, 1997, at approximately 6:15 p.m. to find Hartman sleeping. She further stated that she had an answering machine, but

that she did not recall if it was turned on. Ms. Parcell also confirmed that her home phone received six calls from the Inn Between bar between 12:07 a.m. and 1:19 a.m., on September 10, 1997. Ms. Parcell stated that she never heard the phone ring and did not answer those calls.

The Defense then called Petitioner Hartman. Hartman testified that, while he remembered talking about the O.J. Simpson trial at work, he did not specifically recall talking to Hoffman or making the comment regarding cutting off the victim's hands. Hartman further testified that he had sex with Ms. Snipes several times before September 8, 1997. Hartman recounted that he stopped into the Bucket Shop on September 8 and ran into Ms. Snipes. He testified that Ms. Snipes asked him back to her place. Unable to buy carry-out beer from the Bucket Shop, Hartman testified that he ran over to the Inn Between to buy four 16 ounce bottles of Budweiser.

Hartman then gave the following account of his encounter with Victim Snipes that evening: The two walked to Ms. Snipes apartment. While in the apartment Hartman picked up a white lawn chair and sat by the window while Ms. Snipes adjusted her hair dye in the bathroom. Upon Ms. Snipes' request, the two took a walk around 2:30 a.m. After returning to the apartment, Hartman and Snipes danced briefly. Hartman attempted to adjust the blinds, but Snipes told him not to touch anything. After dancing, they undressed each other and had vaginal sex without a condom. Hartman denied having oral or anal sex with Ms. Snipes. He also denied participating in any kind of bondage.

Hartman also testified that the phone rang while he was having intercourse with Snipes, but she did not answer it. Hartman testified that Winda Snipes told him,

"Well, you got to leave now, my boyfriend is coming over." (Trial Tr. 1823). Hartman further testified that Ms. Snipes was adamant about getting him to leave immediately, and so he left and arrived home between 3:30 a.m. and 4:00 a.m.

Hartman testified that, during the afternoon on September 9, 1997, he spoke twice to Jessica O'Neill. Around 7:45 p.m., Hartman returned to Highland Square. He testified that he went to Winda Snipes' apartment to "hopefully see if [he] [could] get laid." (Trial Tr. 1832.) Hartman entered the apartment building through an open side door and went to Ms. Snipes' apartment. He testified that he heard soft music coming from her apartment and that he knocked and tried the door handle.

While on the stand, Hartman gave the following account of what happened next: The door was unlocked. He walked into the apartment and saw a leg draped over the bed. He approached the body, realized that the body had no hands, and "freaked out." (Trial Tr. 1839). Questioning whether Winda Snipes was still alive, Hartman reached down to find "if I could feel a pulse or something." (Trial Tr. 1837). Hartman had blood on his hand, so he went into the bathroom to wash off the blood. After washing the blood off, he wiped all the places that he remembered having touched and started to collect beer bottles, cigarettes, and ashtrays from the previous night. After collecting these items, he grabbed her apartment keys, left, and locked the door behind him. He also testified that he threw the keys and the bag into a dumpster behind Ms. Snipes' apartment building.

Hartman testified that he ran back to his apartment and changed his clothes. Hartman further testified that he was at his apartment for only five or six minutes before he went back to the Inn Between Bar, near the location of Winda Snipes'

apartment. Hartman went on to get intoxicated. Hartman also admitted that he made the three 9–1–1 calls and watched the investigation from behind a tree. Hartman further testified that he returned to the bar and continued to drink and play pool.

Hartman stated that he later decided to tell the police he had been at Winda Snipes' apartment because he believed that his prints would be found there. He explained that the police took him to the police station the next morning to answer questions. He then testified that he returned to his home with the police and approved searching his home, when they found the bloody shirt. During direct examination, Hartman also denied having told a fellow inmate that he had lost his temper with Ms. Snipes and harmed her. Hartman's testimony concluded the defense's case. The jury subsequently returned a guilty verdict as to all charges in the indictment.

On May 18, 1998, the trial court conducted a mitigation hearing. After opening arguments, the prosecution called its first and only witness, Ella Snipes, the victim's mother. Ella Snipes mentioned that the victim was the eldest daughter of three children and that the victim maintained a very close relationship with her family even after she moved to Akron, Ohio. Snipes described how difficult the holiday season and nine months since the victim's death had been on herself and her family. Defense counsel did not cross-examine the witness but objected to the victim-impact evidence.

The defense then called Rhea Wolpert, Hartman's older sister. Wolpert gave general background regarding Hartman's first five years of life. Rhea Wolpert also provided evidence regarding the history of alcoholism in the family and difficulties that Hartman had experienced with drugs

and alcohol. Wolpert additionally testified that when Hartman was seventeen, he and his mother lived with her for about two years. Rhea Wolpert characterized Hartman as a hard worker who had slight problems with authority.

On cross examination, the State elicited from Wolpert that she had little contact with Hartman from when he was five until he turned seventeen.

As their second and final witness, the defense called Arletta Hartman, Hartman's aunt. Arletta Hartman provided very limited testimony but described some difficulties Hartman had with his stepfather and a sister-in-law as a child.

The entire mitigation testimony put on by Hartman's trial counsel resulted in only slightly more than forty pages of trial transcript. On the same day as the mitigation evidence was presented, May 18, 1998, the jury returned a verdict that recommended the death penalty.

## C. TRIAL COURT WEIGHING

Pursuant to Ohio Rev.Code § 2929.03(D)(3), the trial court weighed the aggravating factors against the mitigating factors. On May 22, 1998, the trial court concluded that the aggravating circumstances outweighed all of the mitigating factors Hartman advanced, and imposed the death penalty on the aggravated murder count. The court also sentenced Hartman to ten years for kidnapping and five years for tampering with evidence, to run consecutively to each other and to the sentence for aggravated murder.

## D. DIRECT APPEALS

As a matter of right, Hartman appealed directly to the Ohio Supreme Court. In his appeal to the Ohio Supreme Court, Hartman raised thirteen propositions of law. Among Hartman's grounds for appeal, he raised the issues of ineffective assistance of counsel. Hartman also challenged the sufficiency of the evidence regarding aggravated felony murder, the capital specification, and the separate kidnapping offense. On October 3, 2001, the Ohio Supreme Court rejected his claims. *See Hartman,* 754 N.E.2d at 1183.

Moreover, as required by Ohio Rev. Code § 2929.05, the court conducted an independent weighing analysis. The Ohio Supreme Court concluded that the aggravating factors outweighed the mitigating factors. *Id.*

## E. STATE POST–CONVICTION PROCEEDINGS

Hartman also exhausted his post-conviction remedies, unsuccessfully. On May 14, 1999, Hartman filed a petition to vacate or set aside the sentence pursuant to Ohio Rev.Code § 2953.21 (post conviction relief) with the Summit County Court of Common Pleas (Case No. 97–09–1987). On October 23, 2000, the trial court denied Hartman's petition for post-conviction relief. Hartman filed a notice of appeal from the trial court's denial of his post-conviction relief. Simultaneously, he filed a motion for delayed appeal.

On October 24, 2001, the Ninth District Court of Appeals denied Hartman's motion and dismissed the appeal. On October 29, 2001, Hartman filed a motion to reconsider. However, the Ninth District Court of Appeals denied the motion on October 31, 2001.

On November 9, 2001, Hartman filed a notice of appeal from the Ninth District Court of Appeals' ruling. The Ohio Supreme Court declined jurisdiction over Hartman's appeal on January 16, 2002. On January 18, 2002, Hartman filed an application to reopen his direct appeal. The Ohio Supreme Court denied Hart-

man's application for reopening on March 20, 2002.

On January 16, 2003, Hartman filed a federal petition for a writ of habeas corpus that contained eleven claims for relief. This Court now reviews that petition.

## II. LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), codified principally at 28 U.S.C. § 2254(d), governs this case since Hartman filed his habeas petition after the effective date of the AEDPA. Under the AEDPA, a writ of habeas corpus may issue only if the state court adjudication of an issue:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

All of Petitioner Hartman's claims include mixed questions of law and fact for which 28 U.S.C. § 2254(d)(1) provides the applicable standard of review.

The U.S. Supreme Court interpreted § 2254(d)(1) in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "In determining whether a decision is contrary to or involved an unreasonable application of clearly established federal law," federal courts may only look to the "holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Bulls v. Jones,* 274 F.3d 329, 333 (6th Cir.2001) (citing *Williams,* 529 U.S. at 412, 120 S.Ct. 1495) (internal punctuation omitted).

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases," or "if the state court confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision ... and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.* (quoting *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495).

A decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* However, "the term 'unreasonable' is not synonymous with incorrect." *Schoenberger v. Russell,* 290 F.3d 831, 834 (6th Cir.2002). Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 834 (quoting *Williams,* 529 U.S. at 411, 120 S.Ct. 1495). "Instead, the correct inquiry is 'whether the state court's application of clearly established federal law was objectively unreasonable.'" *Id.*

■ Before a federal court can consider a state court error under 28 U.S.C. 2254(d), the habeas petitioner must exhaust his state remedies. 28 U.S.C. § 2254(b). To decide whether the petitioner has met the exhaustion requirement, the Court examines whether the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

As explained above, Hartman has pursued all opportunities for relief at the state level, both on direct appeal and in post-

conviction proceedings. Therefore, Hartman has exhausted all state remedies.

However, habeas petitioners face an additional hurdle before federal courts may review a question of federal law decided by a state court. As applied in the habeas context, the doctrine of procedural default prevents federal courts from reviewing claims that a state court has declined to address because of a petitioner's noncompliance with a state procedural requirement. *See Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The Sixth Circuit uses a four-step analysis to decide whether a party has defaulted a claim. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). Under *Maupin*, the Court determines: (1) whether the petitioner failed to comply with an applicable state procedural rule; (2) whether state courts actually enforced the state procedural sanction; (3) whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review, and if the previous elements are met; (4) whether the petitioner has demonstrated "cause and prejudice" to excuse the default. *Id.*

The State contends that Hartman procedurally defaulted some claims entirely and parts of other claims. The Court considers this argument in the context of the individual claims.

## III. GROUNDS FOR RELIEF

The Court now reviews Petitioner Hartman's grounds for relief. As explained below, the Court finds that all of Hartman's claims are without merit. The Court, therefore, DENIES Hartman's petition for a writ of habeas corpus.

## A. ACTUAL INNOCENCE

Petitioner Hartman first asserts that he is actually innocent of the murder and kidnapping of Ms. Snipes.[4] Hartman insists that evidence not tested for trial supports his actual innocence claim. Specifically, Hartman argues that DNA testing of semen samples from Ms. Snipes' vaginal and anal cavities, analysis of fingerprints on the clock whose cord was used to strangle Ms. Snipes, analysis of human hairs recovered from Ms. Snipes' body, and genetic testing of a used condom found in Ms. Snipes' apartment will prove the presence of another person in Ms. Snipes' apartment at the time of the crime. If such evidence were subjected to meaningful analysis, Hartman contends that no reasonable jury could have convicted him of the murder and kidnapping of Ms. Snipes.

The State initially argues that Hartman procedurally defaulted this claim. Even if the Court concludes that Hartman did not default the claim, the State argues that Hartman fails on the merits of his actual innocence claim.

Actual innocence claims are of two varieties: (1) *freestanding* actual innocence claims in which a petitioner asserts that even if the trial is free of all constitutional error, the petitioner is innocent, and (2) *gateway* actual innocence claims, or those in which an assertion of constitutional error accompanies the actual innocence claim at trial. Different standards govern these two types of actual innocence claims. To succeed on a freestanding innocence claim, a petitioner must convince a court that new facts unquestionably establish the petitioner's innocence. *See Schlup v. Delo*, 513 U.S. 298, 316, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). In contrast, to suc-

---

**4.** In the superceding indictment, Hartman was charged both with aggravated murder and with kidnapping. The jury convicted on both counts.

ceed on a gateway claim of actual innocence accompanied by constitutional errors, a petitioner must show evidence that establishes "sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice." *Id.* In bringing his actual innocence claim, Hartman appears to argue both types of actual innocence claims.[5]

■ The Court begins by analyzing whether Hartman has defaulted his actual innocence claims. Generally, a petitioner's procedural default of a claim in state court will preclude habeas review of that claim in federal court. *Simpson v. Jones,* 238 F.3d 399, 406 (6th Cir.2000). Specifically, a federal court may not review constitutional claims when a state court has declined review on the merits "pursuant to an independent and adequate state procedural rule ... unless the [petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

■ If Hartman were actually innocent of the crimes, the Court's failure to consider the claims would result in a fundamental miscarriage of justice. *See Herrera v. Collins,* 506 U.S. 390, 417, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Therefore, the Court concludes that Hartman has not procedurally defaulted this claim. After reviewing the new evidence proffered by Hartman, however, the Court concludes that it lacks jurisdiction over Hartman's freestanding actual innocence claim and

that Hartman fails on his gateway actual innocence claim.

The Court begins by analyzing Hartman's freestanding actual innocence claim. The Supreme Court has generally held that a freestanding actual innocence claim is not cognizable. *See Herrera* 506 U.S. at 404, 113 S.Ct. 853 ("[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."). However, in dicta, the Supreme Court has stated that "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional." *Id.* at 417, 113 S.Ct. 853. This language suggests that a petitioner who can prove actual innocence through new evidence after trial presents a cognizable habeas claim. With his petition, Hartman asserts that additional discovery would enable him to make the extraordinarily high showing necessary for a freestanding actual innocence claim. In reliance upon this argument, the Court granted Hartman discovery on the most central of his actual innocence claim DNA testing of the seminal fluids obtained from Winda Snipes' anal cavity.

■ At Hartman's request, and recognizing the equitable power of courts in the habeas context, the Court ordered DNA testing of semen retrieved from Ms. Snipes' vaginal and anal cavities. Hartman averred that this testing would support his actual innocence claim by showing that the semen in the anal cavity came from another individual.[6] However, the

---

5. In ¶ 2 of his First Claim for Relief, Hartman suggests that he is raising a freestanding actual innocence claim. In ¶ 9 of this Claim, Hartman confirms that he is asserting both

freestanding and gateway claims of actual innocence.

6. Hartman maintained that he had only vaginal intercourse, not anal intercourse, with

results of the test confirmed that Hartman was the source of semen found in both the vaginal and anal cavities. This evidence does not bolster Hartman's actual innocence claim. This showing is significant as Coroner Platt gave unchallenged testimony that the semen specimen found in Winda Snipes' anal cavity was deposited near the time of her death. Further undermining his actual innocence claim, Hartman shows no evidence that anyone else was with Winda Snipes near the time of her death. Since Hartman has not made any persuasive showing of actual innocence based on new evidence, the Court does not need to decide whether the Supreme Court recognizes a freestanding actual innocence claim. Hartman does not make a compelling showing of actual innocence, and the Court concludes that it lacks jurisdiction over this claim. *Id.* at 404, 113 S.Ct. 853.

The Court next turns to Hartman's gateway actual innocence claim. To succeed on this claim, the Court must be convinced that new facts raise sufficient doubt about Hartman's guilt to undermine confidence in the results of the trial without the assurance that the trial was untainted by constitutional error. *Schlup,* 513 U.S. at 317, 115 S.Ct. 851. Upon such a showing, the Court may consider defaulted claims to guarantee that a great injustice does not occur. *Id.*

Recently, however, the Supreme Court has warned against courts considering the "actual innocence" exception to procedural default before first addressing all non-defaulted claims for comparable relief and other grounds for cause to excuse the procedural default. *Dretke v. Haley,* —— U.S. ——, 124 S.Ct. 1847, 1852, —— L.Ed.2d

—— (2004).[7] Here, the Court finds that no non-defaulted claim gives Hartman the relief he seeks. Therefore, the Court addresses Hartman's gateway actual innocence claim on the merits.

■ The Court concludes that Hartman does not prevail on his gateway actual innocence claim. Hartman has failed to show that "new facts raise[ ] sufficient doubt about [his] guilt to undermine confidence in the result of the trial." *See Schlup,* 513 U.S. 317, 115 S.Ct. 851. Hartman offers no new evidence supporting his contention that he is innocent of the murder of Winda Snipes. To the contrary, the new evidence of DNA results retrieved from Ms. Snipes' vaginal and anal cavities undermine his claim of actual innocence since it shows him as the source of the deposited semen. Coroner Platt testified that "penetration ensued at a time interval equivalent to the time that the—or close to the time the decedent met her death." (Trial Tr. 1391). Comer Platt further testified that "the acid phosphatase is in the—at a level which would be, again, consistent with the time of her death." (Trial Tr. 1392).

In making his actual innocence claim, Hartman represented that he could not have deposited the seminal fluids found in Winda Snipes' anal cavity, fluids that we know from Coroner Platt were deposited near the time of death. Hartman testified:

Q. Did you have sex with her [on September 8, 1997]?

A. Yes, I did.

Q. Plaintiff Hartman, you have—what kind of sex?

---

Ms. Snipes 12 to 14 hours before the murder. Therefore, DNA proof that the semen did not belong to Hartman would support his claim of actual innocence by showing that another individual had sex with Ms. Snipes around the time of her death.

7. The Court observes that *Dretke* involved an actual innocence claim in a non-death penalty context. However, the holding is not limited to such cases.

A. Just regular vaginal sex.

Q. Okay. At any point did you have anal sex with her?

A. No, I did not.

(Trial Tr. 1822–23).

Hartman agrees that the seminal fluids found in Winda Snipes' anal cavities identify her murderer: "Based upon the coroner's testimony, the most likely evidence available for the identification of Ms. Snipes' assailant is the semen and seminal fluid found in her vaginal and anal cavities." Pet. Mot. for Discovery at 30. Given Coroner Platt's testimony and the DNA match with Hartman, Hartman's newly discovered evidence only supports a conclusion that he killed Snipes. Therefore, Hartman's gateway actual innocence claim fails.

## B. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In his second claim, Hartman argues that his trial attorney failed to provide effective assistance at trial. With this claim, Hartman alleges seven purported instances of ineffective assistance of trial counsel. Specifically, Hartman alleges two instances of ineffective assistance occurring in voir dire, four instances of ineffective assistance occurring during the guilt/innocence phase and a sub-claim arising in the mitigation phase. The state courts rejected Hartman's ineffective assistance of trial counsel claim. This Court determines if the state trial and appellate courts' decisions are contrary to or an unreasonable application of *Strickland v.*

*Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The two-part *Strickland* analysis governs Sixth Amendment claims of ineffective assistance of counsel. The first prong of the *Strickland* test requires Hartman to establish deficient representation by counsel. This requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. According to the Court in *Strickland:*

> Judicial scrutiny of counsel's performance must be highly deferential .... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).[8] Thus, to constitute deficient representation, counsel's actions must be more than failed tactical decisions.

Under this standard, a petitioner must show that counsel's performance was defi-

---

**8.** Speaking to the need to avoid hindsight evaluations, the Supreme Court in *Yarborough v. Gentry,* 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003), quoted Justice (former Solicitor) Jackson:

> I made three arguments of every case. First came the one that I planned—as I thought, logical, coherent, complete. Second was the one actually presented—interrupted, incoherent, disjointed, disappointing. The third was the utterly devastating argument that I thought of after going to bed that night."

cient and that such performance prejudiced the defense. *Id.* To establish deficient performance, a petitioner must show that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. Considering all the circumstances determines reasonableness. *Id.* To show prejudice, the petitioner must show to a reasonable probability that, but for counsel's errors, the outcome would have been different. *Id.* at 694, 104 S.Ct. 2052. Accordingly, the Court examines each sub-part of this claim to decide if the state courts' decisions were contrary to or unreasonable applications of *Strickland.*

### 1. Ineffective Assistance Of Counsel During Voir Dire

#### (a) Juror Mary Enders

During voir dire, Juror Enders related that ten years earlier a victim's family members harassed her daughter-in-law after she served on a jury in Reno, Nevada that acquitted a murder suspect. Hartman contends that his trial counsel were ineffective for failing to question the other jurors to learn whether Juror Enders' statements affected them and for failing to challenge Juror Enders for cause.

Hartman raised this claim in the state courts, who rejected it. The state courts found no deficiency in trial counsel's performance and no bias by Juror Enders. The Court now determines that the state courts' denial of this claim was neither contrary to nor an unreasonable application of *Strickland.*

■■■■■ A trial court should excuse a potential juror for cause because of his or her views where the juror's views would "prevent or substantially impair the per-

formance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In this habeas corpus case, the question of whether individual jurors are biased "is not one of mixed law and fact" but rather "is plainly one of historical fact" developed from the state record below. *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Since the question of the impartiality of an individual juror is "essentially one of credibility, and therefore largely one of demeanor," the trial court's determination is due "special deference," (*id.*), and may "be overturned only for 'manifest error.'" *Id.* at 1031, 104 S.Ct. 2885. As such, state court determinations are entitled to the application of the statutory presumption of correctness under 28 U.S.C. § 2254(d). *Id.* at 1036–38, 104 S.Ct. 2885; *Scott v. Mitchell,* 209 F.3d 854, 879 (6th Cir.2000). On habeas review, the Court examines whether the record supports the state courts' conclusion that the jurors could be impartial. *See Patton,* 467 U.S. at 1038, 104 S.Ct. 2885 (1984).

■■■■ The Court concludes that adequate support exists for the state courts' conclusions regarding the impartiality of the jurors. During voir dire, Juror Enders explained that her daughter-in-law's experiences would not affect her in any way, and she could follow the law as instructed by the trial court.[9] The Ohio courts reasonably applied Supreme Court precedent when they found the juror indicated she could render a verdict based on the evidence. *McQueen v. Scroggy,* 99 F.3d 1302, 1320 (6th Cir.1996) ("The trial judge's decision that Leo Johnson could obey the instructions of the court and could put any biases aside was one of

---

**9.** Ms. Bandy: Anything about that experience that your daughter-in-law had that you feel would interfere with your ability to be fair and impartial in this case?

Juror Enders: No. I just wanted to let you know that.
(Trial Tr. 767–768).

historical fact. Therefore, the trial judge's decision is one entitled to great deference.").

As an observer of this exchange, trial counsel were better able to decide if Juror Enders could perform her duties according to the instructions. Trial counsel's determination on this point is clearly within the range of acceptable practice and is not deficient under the first prong of *Strickland*. Similarly, the Court finds no deficiency when trial counsel did not question other jurors about Juror Enders' description of the ten-year previous experience of her daughter-in-law. Given the relatively benign description of events occurring more than ten years before, trial counsel could reasonably believe other jurors had not been unduly influenced by the brief comments.

Moreover, Hartman also fails to meet the second prong of *Strickland* because he has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Accordingly, the Court denies this subpart of the ineffective assistance claim.

### (b) Repeated Inquiries Regarding The Victim's Hands

■ Hartman also alleges ineffective assistance of trial counsel during voir dire based on trial counsel's failure to object to the trial court's repeated references to Ms. Snipes' severed hands. The trial transcript makes clear, however, that the trial court merely was attempting to discover whether the prospective jurors had been exposed to excessive pre-trial publicity.[10] By referring to the severed hands, likely the most memorable fact of the case mentioned in media sources, the trial court could accurately determine whether the jurors had knowledge of the case. Trial counsel could reasonably withhold objection because such questioning would illuminate which jurors had been exposed to prejudicial pre-trial publicity. Such information would assist trial counsel when deciding which jurors to challenge. Therefore, the Court finds no merit in Hartman's argument that it was unconstitutional error for his counsel not to object to these references.

### 2. Ineffective Assistance During Guilt/Innocence Phase

### (a) Failure To Secure Forensic Experts

■ Hartman next claims that trial counsel were ineffective for failing to secure forensic experts during the guilt phase of the trial. Forensic experts, Hartman claims, could have conducted DNA

10. The trial court's statements about the severed hands arose in the context of the court attempting to determine if the juror's had any knowledge of the case.

> The Court: Ms. Steele, we brought you in here to ask you a couple of questions on two very narrow issues but very important issues: Pretrial publicity, what you know or may not know about the case, and your thoughts and feelings on capital punishment. Let's begin by saying, with the limited information that I gave you out in the courtroom, do you think you know anything about this case, read anything about it or heard anything about it?

> Juror Steele: I have to be honest, I never heard of it.
> The Court: That's fine, there's nothing wrong with that. I think both sides will tell you, as a matter of fact, that that's good. We prefer to have people that don't know anything about it. Let me give you a little more information and see if that jogs your memory. When the victim was found in this case, she had—her hands were cut off. Does that ring any bell or some notoriety because of that?
> Juror Steele: Not really.
> (Trial Tr. 114–115).

testing on human hairs and semen recovered from Ms. Snipes' vaginal and anal cavities

Initially, the Court notes that trial counsel's decision not to secure any experts in a case in which expert evidence formed the crux of the State's evidence was poor judgment. The Court concludes, however, that this claim is without merit because Hartman can show no prejudice from counsel's failure to secure forensic experts. *See Strickland*, 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed.").

Even assuming trial counsel acted deficiently in not securing forensic experts, Hartman makes no showing of prejudice. Here, Hartman merely speculates that his forensic experts *might* have found exculpatory evidence. In fact, some testing that Hartman asserts should have occurred by experts before trial was conducted at the order of this Court. This evidence fails to exonerate Hartman. To the contrary, the forensic evidence solicited by Hartman shows that he engaged in anal sex with Winda Snipes near the time of Snipes death on September 9, 1997.[11] Given that the forensic evidence suggests that Hartman killed Winda Snipes, the Court finds no prejudice. *See, e.g., Zinzer v. Iowa*, 60 F.3d 1296, 1299 (8th Cir.1995) (where proffered evidence from post-conviction expert did not exonerate a defendant, trial counsel was not ineffective for failing to retain expert).

(b) *Failure To Object To The Admissibility Of Opinion Testimony Of Patrick Warrick*

Hartman argues in this sub-part of his petition that his trial counsel failed to pro-

vide effective assistance at trial when they failed to object or secure an expert to prepare and cross-examine a latent fingerprint examiner, Patrick Warrick. Relatedly, Hartman contends that the trial counsel were ineffective in failing to challenge the admissibility of Mr. Warrick's testimony. Warrick, a fingerprint examiner from the King County Sheriff's Office in Seattle, Washington, testified that by using digitally enhanced imaging, he concluded that a fingerprint found on Snipes' bedspread was defendant's fingerprint. In addition, fingerprint examiner Warrick testified that he had also compared the fingerprints without using digitally enhanced imaging and reached the same conclusion. *Hartman*, 754 N.E.2d at 1165.

Although Hartman characterizes this as a claim of ineffective counsel, Hartman basically challenges the state trial court's admission of expert testimony. The state court's interpretation of its evidentiary rules "is no part of a federal court's habeas review of a state conviction. We have stated often that 'federal habeas corpus relief does not lie for errors of state law.'" *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Habeas courts do not review questions of state evidentiary law unless it gives rise to a fundamentally unfair trial.

As to witness Warrick, Hartman provides no winning argument showing how his counsel fell below an objectively reasonable standard. First, the trial transcript makes clear that trial counsel did, in fact, object to the qualifications of Mr. Warrick. (Trial Tr. 1337, 1347–48, 1353). Moreover, as a matter of state law and

---

11. Orchid Cellmark, the testing agency selected by Hartman, reported:

"Based on these results, Brett Hartman is the identified as the contributor of the DNA found in the male fraction from the vaginal swab and the male fraction from the anal swab."

federal due process analysis, Warrick's use of digitally enhanced imaging is admissible. In *State v. Hayden,* 90 Wash.App. 100, 950 P.2d 1024 (Wash.App.1998), the Washington Supreme Court approved the use of digital imaging enhancement under the more stringent standard announced in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). The *Hayden* court found "there does not appear to be a significant dispute among qualified experts as to the validity of enhanced digital imaging performed by qualified experts using appropriate software, we conclude that the process is generally accepted in the relevant scientific community." 950 P.2d at 1028. Here, the Ohio Supreme Court found the digitally enhanced fingerprint evidence was admissible under the more lenient federal rules and Ohio rules. *Hartman,* 754 N.E.2d at 1166. Even if this Court were reviewing Ohio evidence law, which it is not, Hartman shows no error in the admission of the digitally enhanced fingerprint evidence.

■■■■ As with the prior forensic expert evidence claim, the Court also finds that this claim fails since Hartman does not show any prejudice from his trial counsel's failure. Although Hartman intimates that an expert would have aided his case, Hartman fails to show how the outcome of trial would have been different if he had the benefit of an expert.

*(c) Failure To Object To The Admissibility Of Opinion Testimony Of Rod Englert*

■■■■ Hartman avers that trial counsel also failed to provide effective assistance when they failed to object or secure an expert to prepare and cross-examine bloodstain pattern analysis expert Rod Englert. Hartman's trial counsel, however, did object to the testimony of witness Englert. (Trial Tr. 1421). Second and also contrary to Hartman's argument,

Englert testified that his testimony regarding the blood-transfer stains was based on "a reasonable degree of scientific certainty as to the manner in which the transfer stains on the tee-shirt that we talked about were placed there." (Trial Tr. 1376). Third, Hartman makes no showing that the trial court's evidentiary ruling allowing the testimony resulted in a constitutional violation. As described by the Sixth Circuit in *Baze v. Parker,* 371 F.3d 310 (6th Cir.2004):

> Only if an evidentiary ruling is so egregious that it results in a denial of fundamental fairness does it violate due process and thus warrant habeas relief. Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.

*Id.* at 324 (citations and internal quotations omitted).

As to Englert's qualification to give opinion evidence, Englert had extensive experience and education, had testified as an expert on blood stain matters more than 230 times, had lectured more than 530 times to law enforcement audiences, and had taught courses on blood stain analysis throughout the United States and internationally, including to Scotland Yard. The determination of evidence admissibility is a state law matter and Hartman makes no showing that the Ohio ruling impaired any federal right.

Finally, and as with Hartman's other expert claims, this claim fails since Hartman does not show how an expert would have changed the outcome of the trial. Absent such a showing, the Court cannot conclude that trial counsel's failure was harmful to Hartman and that he was prejudiced by it. *See Hamblin v. Mitchell,* 354 F.3d 482, 494 (6th Cir.2003).

*(d) Failure To Object To Improper Jury Instruction, Comments From Prosecutor, And Admissibility Of Additional Evidence*

With this sub-part, Hartman suggests that trial counsel were ineffective in failing to object to various evidence and statements made during trial. First, Hartman suggests that trial counsel were ineffective for failing to object to improper jury instructions. Because the Court concludes in Section G that the underlying jury instruction was not improper, Hartman's claim that trial counsel were ineffective for failing to object lacks merit.

Hartman also contends that trial counsel were ineffective for failing to object to improper statements by the prosecutor. As to this claim, Hartman states that the prosecutor improperly introduced victim-impact testimony during the guilt phase of the proceedings through the testimony of Kathryn Snipes–Gaskey; improperly misrepresented evidence from Dr. Platt, Hartman's co-worker Chris Hoffman, and Hartman himself; and made improper arguments during the mitigation phase closing argument. Hartman also contends that his defense counsel failed to object to the introduction of cutting knives from Hartman's place of employment.

The Court finds that Hartman fails to show that Ohio violated clearly established law or unreasonably applied federal law in admitting the testimony of Kathryn Snipes–Gaskey, Winda Snipes' sister. Ohio called the sister to identify the victim's wristwatch that had been found at Hartman's apartment. Such evidence was obviously relevant. In examining Snipes–Gaskey, the State briefly questioned her about the victim's general life story and minimally about her contact with Winda Snipes shortly before her killing, including their phone calls discussing hair coloring. The State also solicited testimony that Winda Snipes wrote her family three or four times a week, including a letter that was delivered after Snipes' death. In addition, the State solicited testimony identifying certain photographs, including photographs used at Winda Snipes' funeral service. Defense counsel did not object. As found by the Ohio courts, Snipes–Gaskey's testimony was "not overly emotional or directed to the penalty to be imposed." *Hartman,* 754 N.E.2d at 1172. This Court agrees.

The admission of Snipes–Gaskey's testimony nowhere implicates Hartman's due process rights. First, the testimony was highly relevant. Police recovered a woman's watch from Hartman's apartment. Snipes–Gaskey identified the watch as her sister's. Regarding the receipt of a letter from Winda Snipes after her death, Hartman testified that on September 9, 1997, he had gone with Snipes to mail a stick of gum to her mother at approximately 2:30 a.m. (Trial Tr. 1819). Evidence of the letter was obviously relevant as was identification of the wristwatch found at Hartman's apartment. The State solicited little other evidence from Snipes–Gaskey.

Trial counsel's failure to object to Snipes–Gaskey's testimony was no failure to afford the representation to which Hartman was entitled. As important, Hartman makes no showing that he was prejudiced by this brief testimony.

Hartman also says that he was denied the effective assistance of counsel when his trial attorney failed to object to the introduction of certain knives identified as owned by Hartman. This claim has no obvious merit. The knives were relevant and not unduly prejudicial. That Hartman's trial counsel did not object to their introduction does not show an error so serious that counsel was not functioning as

the "counsel" guaranteed the defendant by the Sixth Amendment.

■■■ Likewise, the prosecutor's remarks were limited and isolated. In light of the other evidence properly before the jury, Hartman has not shown that his counsel's failure to object was deficient. Also, he does not show that the trial would have turned out differently if the allegedly improper statements had been excluded. In the absence of a showing of prejudice, the Court concludes that the Ohio courts were not in error in finding that Hartman failed to show ineffective counsel under *Strickland.*

### 3. Ineffective Assistance Of Counsel During Mitigation

#### (a) Ineffective Assistance Of Counsel During Mitigation In Conceding Guilt

With this sub-claim, Hartman asserts that trial counsel were ineffective because trial counsel conceded the blame the jury placed on Hartman through the jury's guilty verdict.[12] Specifically, Hartman objects to trial counsel's statement during the mitigation hearing that "[t]here's nothing I can do, nothing one can say, no evidence we can put on to reduce the blame that you've already ascribed." (Mitig.Tr. 102). Hartman asserts that this statement indicated that trial counsel were abdicating their responsibility to put on mitigation since no evidence could reduce the jury's blame.

■■■ The Court finds the state courts were reasonable in concluding that this statement did not constitute ineffective assistance of counsel. Conceding guilt at the start of the mitigation phase may have been a strategic decision by trial counsel.

Trial counsel may have assumed such a statement was necessary in order to appear credible before the jury. *See Parker v. Head,* 244 F.3d 831, 840 (11th Cir.2001). Moreover, the Court does not conclude that this statement was so significant an error as to deprive the defendant of a fair sentencing with a reliable result. After making this statement, trial counsel proceeded to put on two mitigation witnesses and argued at some length in closing why the jury should spare Hartman's life. Such facts show that trial counsel did not abdicate entirely their responsibility to represent Hartman in the mitigation phase. Rather, the statement merely shows counsel's decision to acknowledge that the jury had found Hartman guilty. Standing alone, the Court finds trial counsel's brief remark in the opening statement of mitigation did not prejudice Hartman and did not constitute deficient performance by trial counsel.

#### (b) Cumulative Error

Finally, Hartman alleges that the cumulative errors made by trial counsel warrant habeas relief. Since the Court finds that Hartman's individual claims lack merit, the claimed prejudicial effect of trial counsel's cumulative errors also does not warrant habeas belief. *See Spears v. Mullin,* 343 F.3d 1215, 1251 (10th Cir.2003). Moreover, the Sixth Circuit has noted that the Supreme Court "has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.2002).

### C. PROSECUTORIAL MISCONDUCT

■■■ Hartman argues that throughout the trial and penalty phase the prose-

---

12. Hartman also alleges a separate claim of ineffective assistance of counsel during miti-

gation in Claim 8.

cutor engaged in numerous instances of improper behavior. To successfully assert a prosecutorial misconduct claim in a habeas proceeding, however, it is not enough that the prosecutor acted improperly. The relevant question is whether the prosecution's conduct so infected the trial with unfairness as to render the trial fundamentally unfair or make the resulting conviction a denial of due process. *See Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The Sixth Circuit has identified the factors to be considered in making this determination as (1) the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks are isolated and extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused. *Roe v. Baker,* 316 F.3d 557, 565–66 (6th Cir.2002). With these factors in mind, the Court addresses each of the prosecutor's challenged actions in turn.

### 1. Victim–Impact Evidence During The Guilt/Innocence Phase

First, Hartman suggests that the prosecutor improperly introduced victim-impact evidence into the trial during the guilt/innocence phase. During trial, Ms. Snipes' sister Kathryn Snipes–Gaskey testified as the state's first witness. During her testimony, Ms. Snipes–Gaskey spoke about the victim's background, character, and family relationships. (Trial Tr. 876–886). At one point, Ms. Snipes–Gaskey identified a scrapbook and pictures that her husband had put together for Ms. Snipes' funeral. She referred to one picture as showing Ms. Snipes' "last Christmas at home." (Trial Tr. 882). She also testified that Ms. Snipes' grandmother and parents received letters from her after her death. (Trial Tr. 886).

The State contends that Hartman procedurally defaulted this claim. Specifically, the State asserts that the Ohio Supreme Court rested its decision on a procedural bar, although it also conducted a plain error review. Hartman does not allege any cause and prejudice to excuse the procedural default but suggests that the State has no legitimate state interest in defaulting a claim of prosecutorial misconduct.

On direct appeal, the Ohio Supreme Court noted that defense counsel did not object to Snipes–Gaskey's testimony at trial, and thus waived all but plain error. Default imposed for failure to object contemporaneously as required by Ohio court rules is an adequate and independent state ground to bar federal habeas review absent a showing of cause and prejudice. *See Engle v. Isaac,* 456 U.S. 107, 124–29, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Scott v. Mitchell,* 209 F.3d 854, 867 (6th Cir.2000). Furthermore, the State has a legitimate, in fact exceedingly strong, interest in having its contemporaneous-objection rule enforced by federal courts. Such a rule that allows for a record to be made while recollections are fresh, contributes to the finality of criminal litigation and prevents "sandbagging" on the part of defense lawyers. *Scott,* 209 F.3d at 870–71.

The Ohio Supreme Court did address Hartman's victim-impact claim pursuant to a plain error analysis. However, plain error review by a state appellate court does not constitute a waiver of the state procedural bar preventing the habeas court from reviewing the claim. *See Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir.2001) ("[W]e view a state appellate court's review for plain error as the enforcement of a procedural default."); *Scott,* 209 F.3d at 866 (same). The Court, therefore, finds

that Hartman procedurally defaulted this claim. In the face of this procedural default, Hartman must show cause and prejudice to excuse the default before the Court can consider the claim. Hartman has failed to do this. Either Hartman's actual innocence claim or his ineffective assistance of trial counsel claim might have provided cause for this default. However, the Court has found these claims to be without merit. Therefore, they cannot provide cause for Hartman's procedurally defaulted claims.

### 2. Misrepresentation Of Testimony And Evidence Elicited At Trial

Next, Hartman contends that the prosecutor misrepresented testimony and evidence during closing argument of the guilt/innocence phase. Specifically, Hartman identifies the misrepresentation of the testimony of a medical examiner, Dr. Platt, misrepresentation of the testimony of Hartman's co-worker, Chris Hoffman, and misrepresentation of the testimony of Hartman himself. In discussing Dr. Platt's testimony, the prosecutor stated:

> Brett Hartman, when he killed Winda Snipes, he didn't have any clothes on. They did have sex. I can't call it sex. He had intercourse with her. He had vaginal intercourse with her. He had anal intercourse with her. The coroner testified she had semen in her vaginal cavity as well as her anal cavity."

(Trial Tr.1986).

Hartman points out that the State never tested the semen in the vaginal and anal cavities. Therefore, the Prosecutor's suggestion that this recovered semen belonged to Hartman was an unwarranted extension of the evidence.

Regarding the testimony of Hartman's co-worker, the prosecutor used this testimony as an explanation for why DNA testing was not conducted. The prosecutor said:

> But I know Brett Hartman [sic] told Chris Hoffman, you know, if I was going to do that, the easiest way to get rid of the evidence is to just cut their hands off and then there wouldn't be any DNA under the nails. There wouldn't be any hair under the nails. Don't go through all that stuff, you know, just cut off the hands.

(Trial Tr.1985–86).

Hartman contends that using the testimony of Chris Hoffman in this manner was improper because the evidence did not support the argument that Hartman had cut off Ms. Snipes' hands to avoid the detection of DNA evidence. In fact, Hartman had no recent cuts or scratches at the time of his arrest the morning of September 10, 1997. Thus, Hartman argues that the state's suggestion as to why Hartman removed the hands is not supported by the evidence.

To a major degree, these arguments depend upon Hartman's argument that his DNA was not found in Winda Snipes' vaginal and anal cavities. As discussed above, Hartman's DNA was found in the examination of Snipes. Therefore, Hartman can make no showing of prejudice by the State's use of these arguments.

██ Hartman, also claims that the prosecutor intentionally misrepresented Hartman's testimony when the prosecutor suggested that evidence supported a conclusion that Hartman and his mother lied to the jury. The prosecutor stated that Hartman did not tell the police that he was the person who made the 9–1–1 calls and discovered Ms. Snipes' body until after the search of his apartment. In fact, Detective Gilbride's testimony showed that Hartman had volunteered to the police that he was the one who found the body. (Trial Tr. 1186–89, 1191, 1205).

While the Court finds that these statements were, to varying degrees, misrepresentations of the evidence, they were too isolated to prejudice Hartman and result in an unfair trial. Even if the comments were improper, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181, 106 S.Ct. 2464. Courts will not find a reversible violation where the comment has little cumulative effect on the jury. *United States v. Ursery*, 109 F.3d 1129, 1135 (6th Cir.1997) (prosecutor's statements referencing possible out of court statements by defendant were not reversible error when remark was isolated).

■■■ A court looks to all the circumstances to decide whether prosecutorial misconduct denied Hartman a fair trial. *Summitt v. Bordenkircher*, 608 F.2d 247, 253 (6th Cir.1979). Although the challenged statements had a small potential to mislead the jury, they occurred in isolated places within six days of trial testimony. The Court, therefore, finds that this claim is without merit.

### 3. Prosecutor's Improper Aggravating Factor Argument During Mitigation

■■■ With his third prosecutorial misconduct sub-claim, Hartman states that the prosecutor denied him a fair sentencing phase when the prosecutor impermissibly referred to the nature and circumstances of the offense as an aggravating factor. During mitigation, the prosecutor argued the circumstances of the crime was an aggravating circumstance: "Winda Snipes was restrained, she was terrorized, over 130 stab wounds, her throat was slit, her hands removed, think about that aggravating circumstance." (Mitig.Tr. 11).

The Court agrees that such argument by the prosecutor was improper.[13] *See State v. Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311 (1996). However, the Court concludes that the prosecutor's inappropriate statement did not prejudice Hartman to allow this Court to grant habeas relief. As with the misstatements of evidence, this statement was isolated and limited in nature. The passing remark did not render the sentencing phase fundamentally unfair. Moreover, the trial court mitigated any prejudice from this statement when it gave the jury appropriate instructions. The trial court properly instructed the jury that the only aggravating circumstance that could be considered was the kidnapping specification. The Court presumes that the jury followed the instructions it received. *See Greer v. Miller*, 483 U.S. 756, 767 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions."). Hartman has not overcome this presumption.

### 4. Cumulative Effect

As with his ineffective assistance claim, Hartman suggests that the cumulative effect of prosecutorial misconduct rendered his trial fundamentally unfair. Because the Court finds no prosecutorial miscon-

---

**13.** The Court finds deeply troubling the prosecutor's references to the gruesome nature of the crime and the post-mortem mutilation of the body. Such facts do not go to the aggravating circumstance at issue in this case. On the other hand, evidence of especially brutal murders and post-mortem mutilation of the victim's body are facts that make jurors significantly more likely to impose death. *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum. L.Rev. 1538, 1555 (1998).

duct as to any of the individual claims, the Court finds no cumulative effect of prosecutorial misconduct.

Additionally, even if the court were to consider the effect of all improper remarks and misstatements of law made by the prosecution as a whole, the Court finds that the remarks did not deprive Hartman of a fair trial. The improper statements were isolated and brief. Moreover, most of the improper remarks occurred at times set aside for arguments by counsel, and the trial court properly used jury instructions to clarify what could and could not be considered by the jury. Although improper prosecution remarks had some potential to mislead the jury, when viewed within the context of the entire trial, the Court does not find that such remarks denied Hartman a fair trial.

## D. ERRORS IN ADMISSION OF EXPERT TESTIMONY

In his fourth claim, Hartman argues that the trial court erred when it admitted evidence concerning the testimony of four expert witnesses: James Wurster, Cynthia Mayle, Patrick Warrick, and Ron Englert. The Ohio courts applied plain error analysis to the claims involving expert witnesses James Wurster, Cynthia Mayle, and Patrick Warrick. Accordingly, the Court concludes that Hartman has not preserved these claims for review. *See Scott*, 209 F.3d at 866.

Hartman did, however, preserve for review by this Court his claim regarding the expert testimony of witness Ron Englert. Englert is a forensic consultant who reconstructs homicide scenes. At trial, Englert testified that the bloody shirt found in Hartman's bedroom was not being worn when someone transferred the bloodstains onto it but was near Ms. Snipes at the time the killer inflicted the wounds. Englert additionally testified as to the freshness of blood found in the apartment. Hartman contends that the trial court erred in allowing Englert to testify as an expert on these matters.

As previously discussed, in reviewing an evidentiary decision of a state court, a habeas court may grant relief only if error in the evidentiary decision resulted in a trial so unfair as to deny the defendant due process. *See Estelle v. McGuire*, 502 U.S. 62, 75, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Court finds no such error in the trial court's decision to allow Englert to testify as an expert.

██ On direct appeal, the Ohio Supreme Court found that "[a]lthough Englert was not a medical doctor, the trial court did not abuse its discretion in allowing him to testify as an expert because of his extensive background and experience in bloodstain analysis." The Court agrees. Englert graduated from the FBI Academy and completed postgraduate work at two universities. Englert's experience consisted of more than twenty-five years as a police homicide investigator. Following his retirement, Englert became a consultant in crime scene reconstruction and blood pattern evidence. Based on these qualifications, the Court finds no constitutional error in the trial court's decision to allow Englert to testify regarding bloodstains on the shirt and blood found at the apartment.

## E. SUFFICIENCY OF THE EVIDENCE AS TO KIDNAPPING

The State of Ohio convicted Hartman of aggravated murder violating Ohio Rev. Code § 2903.01(B) (felony murder). The jury also found Hartman guilty of a separate charge of kidnapping, in violation of Ohio Rev.Code § 2905.01(A). Hartman contends that the evidence was insufficient to prove the elements of kidnapping, arguing the State failed to present sufficient

evidence of a separate animus to kidnap. Without sufficient evidence of kidnapping, Hartman asserts that his conviction of aggravated murder and separate conviction of kidnapping fail:

With this argument, Hartman presents his best argument for habeas relief. Hartman made this argument in his direct appeal to the Ohio Supreme Court. He therefore preserved the claim.

Hartman argues that insufficient evidence supported the jury's finding that Ohio had proven the capital offense specification of kidnapping: "committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping." Ohio Rev.Code 2929.04(A)(7). Hartman principally argues that insufficient evidence showed an animus to kidnap independent of the animus to murder Winda Snipes.

Under Ohio Rev.Code § 2929.04:

(A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt ...

(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, ... and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

The Ohio statute against kidnapping prohibits using force, threat, or deception to remove a person from the place where she is found or restrain her liberty for the purpose of facilitating the commission of a felony or flight thereafter, to terrorize or inflict serious physical harm, or to engage in sexual activity against her will. Ohio Rev.Code §§ 2905.01(A)(2), (3), & (4).

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be based on proof beyond a reasonable doubt as to every fact necessary to make up the crime. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). When a petitioner challenges his conviction in a federal habeas corpus proceeding on the ground that the evidence did not support the jury's verdict, the court decides "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

 Under this standard, district court review is limited. *Id.* at 313, 99 S.Ct. 2781. A conviction may rest on circumstantial evidence and need not remove every reasonable hypothesis except that of guilt. *United States v. Stone*, 748 F.2d 361 363 (6th Cir.1984). Moreover, this habeas court accords deference to a state court's rejection of a petitioner's insufficiency of evidence claim. *Jackson*, 433 U.S. at 323, 97 S.Ct. 2720. Although this Court makes an independent determination of the sufficiency of the evidence underlying the conviction (*see Delk v. Atkinson*, 665 F.2d 90, 94 (6th Cir.1981)), it must also give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. With this standard in mind, the Court examines whether the jury considered evidence sufficient to find beyond a reasonable doubt Hartman's guilt under Ohio Rev.Code § 2903.01(B) and § 2905.01(A).

In Ohio, a criminal defendant becomes eligible for the death penalty if the State convicts the defendant of aggravated murder with at least one aggravating circumstance set forth in Ohio Rev.Code § 2929.04. To obtain Hartman's conviction for aggravated murder, the State of Ohio needed to prove beyond a reasonable doubt that Hartman purposely caused the death of Ms. Snipes while kidnapping or attempting to kidnap her. Ohio Rev.Code § 2903.01(B). To make Hartman eligible for death, Ohio Rev.Code § 2929.04(A)(7) additionally required the State to prove beyond a reasonable doubt an aggravating circumstance—here that Hartman committed the aggravated murder while kidnapping and that Hartman was the principal offender in the aggravated murder.

To convict Hartman of kidnapping, the State needed to prove that through force, threat, or deception Hartman had removed Ms. Snipes from the place where she was found or restrained the liberty of Ms. Snipes to (1) facilitate the commission of any felony or flight after that; (2) terrorize, or to inflict serious physical harm on the victim or another; or (3) engage in sexual activity with the victim against the victim's will. Ohio Rev.Code § 2905.01(A).

 This statutory scheme has an obvious and potentially problematic constitutional problem. In Ohio, kidnapping may serve both to elevate murder to aggravated murder and to make an individual eligible for the death penalty. Arguably, such a scheme could fail to genuinely narrow the class of persons eligible for the death penalty in violation of the Eighth Amendment.[14] *See Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir.2001) (discussing this potential problem). Ohio has resolved

this constitutional problem through the requirement that separate anima exist for the aggravated murder and the aggravating circumstance of kidnapping. *See* Ohio Rev.Code § 2941.25; *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345, 1351–52 (1979).

Under *State v. Logan*, Ohio could charge and convict Hartman of felony murder if the murder occurred during a kidnapping that involved a separate animus to commit the kidnapping. Among other ways such separate animus could be found, the Ohio Supreme Court in *Logan* identified the following circumstances:

> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Id.* at syllabus.

On direct review of Hartman's conviction, the Ohio Supreme Court applied the *Logan* standard to his case and considered whether the restraint sufficiently showed separate animus from the aggravated murder. *Hartman*, 754 N.E.2d at 1162. In the Ohio Supreme Court's words: "the test to determine whether the kidnapping was committed with a separate animus so as to support a separate conviction is whether 'the restraint or movement of the victim is merely incidental to a separate underlying crime' or, instead, whether it has a 'significance independent of the other offense.'" *Id.* (quoting *Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 at syllabus).

The Ohio Supreme Court concluded that the restraint in this case was not merely

---

**14.** The Eighth Amendment requires that statutory criteria for imposing the death penalty substantially narrow the class of person eligible for death from the class of persons committing a crime for which death may be a sentence. *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

incidental to the murder but was independent. In support of this conclusion, the Ohio Supreme Court relied on the following facts:

> Here, the facts present more compelling evidence of kidnapping than in Seiber [*State v. Seiber*, 56 Ohio St.3d 4, 564 N.E.2d 408 (Ohio 1990)]. Defendant tied Snipes to the bed, gagged her, stabbed her one hundred thirty-eight times, slit her throat, and strangled her to death. Moreover, bruising on Snipes's ankles established that she was alive when she was tied to the bed. The evidence therefore shows that Snipes's kidnapping, i.e., the restraint, was completed prior to her murder and that the restraint was not merely incidental to her murder. Therefore, the prosecution presented sufficient evidence to prove not only kidnapping, but also an animus for kidnapping separate from Snipes's aggravated murder.

*Hartman*, 754 N.E.2d at 1162–63.

In dissent from the Ohio Supreme Court's affirmance of Hartman's death penalty, Justice Pfeiffer found insufficient evidence to support the jury's finding that the restraint associated with the kidnapping was distinguishable from the restraint associated with the murder:

> In this case, the alleged kidnapping was in reality a series of actions that were incidental to the crime of murder. The sad truth is that it is easier to stab someone over one hundred times if the victim can't evade you. The majority places great weight on the fact that the victim was tied up before she was killed. The sad truth is that there was no reason to tie up the victim after she was dead. The record does not contain proof beyond a reasonable doubt that a kidnapping occurred. It is possible to believe that a kidnapping occurred; our system of justice requires more. With-

out the kidnapping felony-murder specification, this case is a murder case, not a capital murder case. Despite the grisly nature of the crime, that is what it should be. I would reverse the kidnapping conviction and felony-murder conviction and vacate the sentence of death.
*Id.* at 1183.

In reviewing this finding, the Court determines whether the Ohio Supreme Court's "application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 365, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). While conducting this inquiry regarding whether the Ohio Supreme Court's opinion was objectively unreasonable, the Court repeats that "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.*

In conducting an independent review of this claim, the Court has carefully examined the transcript of the state court proceeding in Hartman's case. The State's case relied exclusively on circumstantial evidence. However, after resolving all conflicts in inferences arising from such circumstantial evidence in favor of the prosecution, the Court finds sufficient evidence of a separate animus for kidnapping to justify application of the aggravating circumstance of kidnapping and the separate charge of kidnapping.

Here, sufficient circumstantial evidence supported the Ohio Supreme Court's finding that the State established the kidnapping charge and specification. Hartman restrained Winda Snipes by tying her leg to the bed. After tying Snipes to the bed, evidence suggests Hartman engaged in sex with Snipes and then beat her. Coroner Platt testified:

> There were multiple injuries to the decedent and those are involving the face. There was a large bruise of the left eye, some hemorrhage in the eye. There

was another bruise of the lower lid on the right eye. There was [sic] cuts or tears of the lower lid. There was a fracture of the bone behind the eye on the roof—behind the eye there is a bone structure, and there's a thin bone and it was fractured.

(Trial Tr. 1363).

*Logan* describes two alternative considerations used to gauge whether the animus motivating the kidnapping differed from the animus motivating the murder: 1) was the restraint prolonged, the confinement secretive, or the movement substantial to show a significance independent of the other offense, or 2) did the asportation or restraint of the victim subject the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime? 60 Ohio St.2d 126, 397 N.E.2d 1345 at syllabus. The *Logan* determination remains focused on whether sufficient evidence suggests that a separate animus motivated the restraint associated with the kidnapping as opposed to the nearly always present restraint associated with the killing.

Under *Logan*, Hartman's jury received significant evidence that his restraint of Winda Snipes subjected her to a substantial increased risk of harm separate and independent of the increased risk of murder. Specifically, tying her leg to the bed significantly increased her risk of harm of assault and rape. Moreover, tying her leg to the bed only marginally increased her risk of the type of murder she suffered—strangulation and a slit throat. If the animus motivating the restraint had been directed to the murder, Hartman would

have tied her hands and arms to impede her resistance to the strangulation.[15]

The jury and the state courts could reasonably find that Hartman restrained Winda Snipes, thereby subjecting her to a substantial increase in risk of harm separate and apart from that involved in the murder. Moreover, the jury and the state courts could find that the animus associated with restraining Snipes was unrelated to her murder. Snipes' small size, only 5 feet, 2 inches tall with a weight of 128 pounds (Trial Tr. 1362), suggests that binding her to the bed was neither necessary to carry out the murder nor likely associated with the murder. Coroner Platt testified that Winda Snipes died quickly, within a short duration after her throat was cut. (Trial Tr. 1386). A reasonable juror could well find that Hartman's restraint of Winda Snipes was motivated by a different animus than the animus motivating the murder.

## F. ERROR IN ADMISSION OF MULTIPLE CUTTING INSTRUMENTS

Hartman asserts that the trial court also erred in allowing the prosecution to introduce knives that Hartmann had access to into evidence. Hartman says the prosecution did not introduce other evidence linking the knives to the murder of Ms. Snipes. Therefore, Hartman contends that such evidence was impermissible "other act" evidence that should have been excluded under Ohio Evid. R. 404(B).

The Court has only limited power in reviewing state courts' evidentiary decisions in a habeas proceeding. A habeas court does not sit as an appellate court to decide whether the trial court abused its

---

**15.** Corner Platt testified that Winda Snipes received "a number of bruises in the upper extremities" and lacerations to the upper extremities. (Trial Tr. 1365). Both findings suggest that Winda Snipes struggled with

Hartman, again suggesting that if the animus of the restraint was to facilitate the murder, Hartman would have restrained the upper extremities.

discretion in making the evidentiary ruling. As previously noted, a habeas court may only grant relief if error in the evidentiary decision resulted in a trial so unfair as to result in a denial of due process. *See Estelle v. McGuire*, 502 U.S. 62, 75, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

As previously discussed, the Court concludes that the knives had relevance to the state's case. Moreover, Hartman has not shown any evidence that this evidentiary decision, when considered in the context of the entire trial, was so damaging as to result in an unfair trial. The testimony regarding Hartman's possession of cutting instruments occurs in only a few brief places within the trial transcript. (Trial Tr. 1117–18, 1234, 1268–69). Furthermore, testimony that none of the cutting instruments contained blood or trace evidence substantially lessened the impact such evidence could have on the jury. Without a showing that the introduction of the knives resulted in an unfair trial, the Court finds this claim to be without merit.

## G. MITIGATION JURY INSTRUCTIONS

Hartman claims that the trial court improperly charged the jury regarding its sentencing determination.

The challenged instruction stated:

If all 12 members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances, as I have defined them, are sufficient to outweigh the mitigating factors, then you must return such finding to the court.

I instruct you, as a matter of law, that if you make such finding, then you have no choice and must make a recommendation to the court that the sentence of death be imposed on the Defendant, Brett X. Hartman.

Should the jury's recommendation be that the death sentence be imposed, the Court must review and evaluate such recommendation and if the Court finds beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, the Court shall then impose the sentence of death.

On the other hand, if after considering all of the evidence raised at trial which is relevant to the issues before you, the testimony, other evidence, and the arguments of counsel, you cannot unanimously agree that the State of Ohio proved beyond a reasonable doubt that the aggravating circumstances, as I have defined them outweigh the mitigating factors, then you'll return your recommendation reflecting your decision.

In this event, you will then proceed to determine which of the three possible life imprisonment sentence to impose. Your finding to the Court shall be one of the following:

1. That Brett Xavier Hartman is sentenced to life imprisonment without parole;

2. That Brett Xavier Hartman is sentenced to life imprisonment with parole eligibility after serving 25 full years of imprisonment, or;

3. That Brett Xavier Hartman be sentenced to life imprisonment with parole eligibility after serving 30 full years imprisonment.

The particular recommendation which you make relative to life imprisonment is binding upon the Court, and I, the Judge, must impose the specific life sentence which you have found.

Hartman contends that this instruction implied that the jury must issue a death sentence unless each juror was convinced that the death penalty was inappropriate. Moreover, the trial court did not tell the jury that one juror's vote could prevent the death penalty from being imposed.

These errors, Hartman asserts, violated his constitutional rights to due process and a fair trial.

The Court first concludes that Hartman procedurally defaulted the part of his claim involving the trial court's failure to give the lone-juror instruction. Although the Ohio Supreme Court reviewed this claim, it did so pursuant to a plain-error analysis since trial counsel did not make the objection at trial.

 Hartman's remaining challenge to the trial court's mitigation phase jury instruction is, however, preserved for review. The charge given by the trial court is modeled after Ohio Rev.Code § 2929.03(D)(2). The Sixth Circuit and Ohio federal district courts have considered similar, in fact largely identical, charges. In *Scott v. Mitchell*, 209 F.3d 854 (6th Cir.2000), the Sixth Circuit found that a sentencing instruction virtually identical to Hartman's was constitutionally sound. Then, in *Roe v. Baker*, 316 F.3d 557, 563 (6th Cir.2002), the Sixth Circuit found no constitutional violation when the sentencing court failed to instruct the jury that unanimity was not required before the jury could consider a life sentence. The Sixth Circuit concluded that no such instruction was constitutionally required. *Id.; see also Taylor v. Mitchell*, 296 F.Supp.2d 784, 812–13 (N.D.Ohio 2003); *but cf. Davis v. Mitchell*, 318 F.3d 682 (6th Cir.2003) (finding that substantially identical instruction improperly required the jury to first "acquit" the petitioner of the death penalty before choosing a life sentence and was constitutional error).[16]

Thus, in light of *Scott* and *Baker*, the Court concludes that the trial court's unanimity instruction was not improper.

## H. INEFFECTIVE ASSISTANCE OF COUNSEL IN MITIGATION

Hartman argues that he was denied effective assistance of counsel in mitigation. Specifically, Hartman contends that his trial counsel failed to present to the jury important mitigation evidence including evidence about his alcoholism, possible attention deficit disorder, and difficult family life. What was presented to the jury on these issues, Hartman avers, was superficial and very brief.

The State concedes that Hartman raised ineffectiveness of counsel in presenting mitigation before the state courts. However, the State argues that the only part of the claim preserved for review by this Court involves trial counsel's failure to present adequate evidence relating to Hartman's alcoholism and substance abuse. Hartman's remaining arguments, the Government asserts, have been procedurally defaulted.

 Upon a careful review of the record, the Court agrees that Hartman has procedurally defaulted parts of this claim. In his direct appeal process, Hartman failed to raise a claim of ineffective assistance of counsel in mitigation. Through his Application to Reopen his Direct Appeal pursuant to Ohio App. R. 26(B), Hartman did challenge trial counsel's ineffectiveness during mitigation. However, this challenge was limited to trial counsel's failure to develop additional evidence of Hartman's alcoholism and substance abuse problem. Hartman has not shown cause and prejudice to excuse the default of the other parts of this claim. The Court concludes, therefore, that the failure to ex-

---

**16.** Although *Davis v. Mitchell* gives support for Hartman's argument, the Court is bound by prior published precedent of the Sixth Circuit since a panel cannot overrule another panel. *See United States v. Smith,* 73 F.3d 1414, 1418 (6th Cir.1996); *Taylor,* 296 F.Supp.2d at 813.

pand on Hartman's alcoholism and substance abuse is the only part of the claim not procedurally defaulted and now considers it.

As previously discussed, *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), defines what is ineffective assistance of counsel. To be ineffective, counsel must act deficiently, and this deficiency must prejudice the defendant. The standard does not provide a bright-line test, and its application in claims of ineffective assistance of counsel in capital cases has been especially problematic. *Hamblin v. Mitchell,* 354 F.3d 482, 485 (6th Cir.2003).

In *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the Supreme Court found that the American Bar Association's standards for counsel in death penalty cases provide the guiding standards to be used in defining the prevailing norms for capital cases. *Id.* at 522, 123 S.Ct. 2527; *see also Hamblin,* 354 F.3d at 486 (applying ABA standards to decide whether counsel were ineffective in mitigation of capital case). In discussing what is a reasonable performance for counsel in mitigation, the Court noted:

> [A]mong the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influence.

*Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527 (emphasis and citation omitted).

Relying on the ABA's standards for legal representation in death penalty cases, the Supreme Court concluded that trial counsel's inadequate investigation of the defendant's life history for mitigating evidence showed deficient performance. *Id.* at 523–25, 123 S.Ct. 2527. The Court made clear that it was not announcing a new rule. *Id.* at 522, 123 S.Ct. 2527 ("In highlighting counsel's duty to investigate, and in referring to the ABA Standards for Criminal Justice as guides, we applied the same 'clearly established' precedent of *Strickland* we apply today.").

The Sixth Circuit has recently addressed the *Wiggins* case and concluded that the "*Wiggins* case now stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance case." *Hamblin,* 354 F.3d at 486.

■■■ Trial counsel's mitigation presentation was not exemplary and in certain respects may have fallen short of the ABA's standards. *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (rev. ed.2003), at Guideline 10.11. Trial counsel's entire presentation of mitigation evidence encompasses only 41 pages of transcript.

At the mitigation hearing, Hartman solicited testimony from a sister and an aunt. The sister, Rhea Wolpert, testified that as a child, Hartman moved to a number of locations over a short period. She testified that Hartman suffered a loss of companionship as a result: "He didn't have a whole lot of friends. We didn't have time to make friends when we moved throughout, it being new and everything." (Mitig.Tr. 38).

She also testified that Hartman suffered from attention deficit disorder. (Mitig.Tr. 39). In addition, she gave testimony regarding Hartman and Hartman's alcoholism. Wolpert also described Hartman's good characteristics: "Yes, he's always been a hard worker, always gone to work . . . . He had two jobs a lot of times at the same time." (Mitig.Tr. 49). And, he did

not have difficulty with authority. *Id.* According to Wolpert, Hartman was no more rebellious than any other child. (Mitig.Tr. 50).

Hartman's trial counsel also offered evidence from Arietta Hartman, Hartman's aunt. She gave consistent testimony that Hartman suffered a disjointed childhood with frequent moves. She also described Hartman as suffering a hyperactive condition. (Mitig.Tr. 64).

Trial counsel obtained the assistance of a psychologist but did not utilize the services of a mitigation specialist. After obtaining the psychologist's report, counsel did not present the psychologist at trial but relied on the sister and aunt to present mitigating evidence. Additionally, trial counsel did not gather any of Hartman's education, medical, or social service records from his stays in group homes and foster care. School and foster care records likely would have been readily available since at the time of trial Hartman was only 23 years old. Trial counsel also did nothing to further explore and corroborate Hartman's statements made during his psychological examination that he had been the victim of physical and sexual abuse. Evidence of this alleged abuse may have been corroborated by the records that trial counsel failed to secure. Such evidence is highly relevant during mitigation. *See Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (noting that consideration of a defendant's life history is a "part of the process of inflicting the penalty of death").

However, the Court does not find that the Ohio courts' determination that trial counsel sufficiently developed Hartman's alcoholism and substance abuse was objectively unreasonable. First, trial counsel did present some evidence, although cursory in scope, of Hartman's substance abuse through the testimony of Hartman's sister

and aunt. Trial counsel elicited the following testimony from Hartman's sister, Rhea Wolpert:

Q: Did you learn about his [Hartman's] getting involved in these kids, street kids and experimenting, if you would, with alcohol and things of that nature?

A: I heard about some of those happenings, yes.

Q: And you heard about that through your mother?

A: Right.

Q: Okay. And did you hear about his OD'ing through your mother?

A: I heard about something like that, yet.

Q: Some kind of alcohol?

A: Yes.

(Mitig. Tr. 43–44).

During direct examination of Hartman's aunt, Arletta Hartman, trial counsel also briefly touched upon Hartman's substance abuse problems:

Q: And some kind of involvement— some kind of drug sale or pills or something to that effect?

A: Yes. And my main concern was his intoxication when he was in the hospital.

Q: That's my next question. Did you learn about his getting involved in alcohol in California?

A: Yes.

(Mitig. Tr. 75–76).

*Strickland* does not require counsel to present every conceivable line of mitigating evidence, regardless of how likely it will be at assisting the defendant. Trial counsel may have strategically decided not to present additional evidence of Hartman's substance abuse based upon a determination that it would not help Hartman. *See, e.g., Davis v. Exec. Dir. of Dept. of Corr.,* 891 F.Supp. 1459, 1466 (D.Colo. 1995) (finding trial counsel's decision not to

present evidence of defendant's alcoholism was reasonable tactical decision). Jurors are not always sympathetic to an individual's difficulties with substance abuse or alcoholism and may perceive evidence of a substance abuse problem to be as much an aggravating factor as a mitigating one. *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L.Rev. 1538, 1565 (finding in an empirical study of jurors who had sat in forty-one capital murder cases, more jurors thought drug addiction was aggravating than mitigating (11.8% to 9.7%)). Here, no evidence suggested that Hartman was inebriated at the time of the crime. In fact, Hartman maintained his denial of any involvement in the crime. Therefore, evidence of his alcoholism and drug abuse could not be found to have diminished his self-control at the time of the offense. Evidence of Hartman's substance abuse problem would only generally address the fact that he suffered from alcoholism and had abused illicit drugs. Trial counsel could reasonably conclude that more in-depth treatment of the issue was unlikely to favorably influence the jury and might, in fact, work to Hartman's detriment.

Even if the Court accepts that trial counsel acted deficiently in failing to present more detailed evidence of Hartman's substance abuse, Hartman has not shown any evidence of prejudice from this inadequate performance. Without some explanation of how Hartman was prejudiced by trial counsel's failure to expand on his substance abuse and alcoholism, trial counsel were not ineffective.

For these reasons, the Court concludes that trial counsel's failure to elaborate on Hartman's substance abuse and alcoholism during mitigation was not ineffective assistance of counsel.

### I. POST–CONVICTION RELIEF MEANINGLESS RITUAL

Hartman argues that Ohio's post-conviction relief procedures fail to provide an adequate and effective corrective process for reviewing constitutional challenges to a conviction or sentence of death. The State contends that Hartman has defaulted this claim and it is also not a proper claim for a habeas action.

 The Court agrees with the State. First, Hartman defaulted this claim by not raising it in either his direct appeal to the Ohio Supreme Court or his Application to Reopen his Direct Appeal. Even if Hartman had not defaulted the claim, the Court finds that the claim is not cognizable in this federal habeas corpus action. The Sixth Circuit has previously concluded that writs of habeas corpus cannot be used to challenge errors or deficiencies in state post-conviction proceedings. *See Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir.1986).

### J. CONSTITUTIONAL CHALLENGES TO OHIO'S DEATH PENALTY SCHEME

With this claim, Hartman raises a number of constitutional challenges to Ohio's death penalty scheme. None of Hartman's allegations are meritorious. In turn, the Court addresses each argument.

#### 1. Bifurcated Trial Process With Same Jury

 Hartman argues that Ohio's bifurcated trial process is unconstitutional since it provides for a sentencing recommendation by the same jury that determines the facts at trial if the accused is found guilty. *See* Ohio Rev.Code § 2929.03(C)(2)(b). Additionally, Hartman claims that the requirement that the trial court submit to the sentencer any pre-sentence report that the defendant requests violates his right to

effective assistance of counsel. *See* Ohio Rev.Code § 2929.03(D)(1).

First, the Court concludes that the federal constitution does not prohibit the same trier of fact from hearing and deciding both the guilt and penalty phases of trial. In fact, the United States Supreme Court has recognized that states have a substantial interest in having a single jury decide all issues in a capital trial. *Lockhart v. McCree,* 476 U.S. 162, 179–80, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The Supreme Court also recognized that a defendant may even benefit at the sentencing phase from any "residual doubts" that the jury might have had during the guilt phase. *Id.* at 181, 106 S.Ct. 1758.

Nor does the Court find unconstitutional Ohio Rev.Code § 2929.03(D)(1)'s requirement that the court submit to the sentencer any pre-sentence report that the defendant requests, even if the report contains prejudicial material. Hartman presents no authority holding that requiring the submission of the report to the fact finder violates the Constitution. The Court observes that no authority requires a defendant to request a pre-sentence report if he is concerned about the prejudicial effect the report may have on the trier of fact. The Court finds no constitutional infirmity in giving a defendant the option of whether to request a pre-sentence report.

### 2. *Lack Of Proper Guidelines For Balancing Aggravating And Mitigating Circumstances*

■ Next, Hartman argues that Ohio's death penalty scheme violates the Constitution because it does not establish adequate guidelines by which to balance aggravating and mitigating factors.

The Supreme Court has held that the Constitution does not require states to guide a sentencer's weighing and balancing of aggravating and mitigating circum-

stances. *Buchanan v. Angelone,* 522 U.S. 269, 274, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). Therefore, the absence of particularly defined standards to balance the relative weight of various aggravating and mitigating circumstances does not render a statutory scheme unconstitutional. *See id.* at 279, 118 S.Ct. 757.

### 3. *Ohio Criminal Rule 11(C)(3)*

■ Hartman complains that Ohio Criminal Rule 11(C)(3) unconstitutionally encourages guilty pleas. By vesting the trial judge with the discretion to dismiss the death specifications "in the interest of justice" when defendants plead guilty, Hartman suggests that Rule 11(C)(3) encourages defendants to plead guilty and forego their right to a jury trial.

The Court observes that even in cases in which a defendant pleads guilty, Rule 11(C)(3) does not necessarily provide an advantage. Under this rule, Defendants who plead guilty are not shielded from the death penalty. Rule 11(C)(3) states that, if the court does not dismiss the specifications, then a panel of three judges shall determine whether the offense was aggravated murder. Upon determining the offense to be aggravated murder, the three judges must weigh the aggravating and mitigating circumstances. Since Rule 11(C)(3) does not result in an automatic avoidance of a sentence of death, the Court rejects Hartman's argument.

### 4. *Failure To Require Sentencing Jury To Identify Mitigating Factors Found*

■ Hartman claims that Ohio's capital sentencing system prevents meaningful appellate proportionality review because it does not require the sentencing jury to identify mitigating factors found when recommending life imprisonment. The Ohio

Supreme Court has previously rejected this argument. *See State v. Jenkins,* 15 Ohio St.3d 164, 473 N.E.2d 264 (1984). The *Jenkins* court held that:

The fundamental purpose behind proportionality review is to ensure that sentencing authorities do not retreat to the pre-*Furman* era when sentences were imposed arbitrarily, capriciously and indiscriminately. To achieve this result, state courts traditionally compare the overall course of conduct for which a capital crime has been charged with similar courses of conduct and the penalties inflicted in comparable cases.

*Id.* at 279. It further held that information regarding mitigating factors "is not an indispensable ingredient in assisting us to determine whether the imposition of a death sentence is disproportionate to sentences imposed for similarly proscribed courses of conduct." *Id.* This is neither contrary to nor an unreasonable application of federal law.

### 5. The Adequacy Of Appellate Proportionality Review

▆ Relatedly, Hartman claims that the Ohio death penalty statutes fail to assure adequate appellate proportionality review. Hartman contends that this results in arbitrary, excessive, and disproportionate sentences. The United States Supreme Court has held that the Constitution does not require a proportionality review of death sentences. *See Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Therefore, any inadequacy in a state-provided proportionality review, even if proven, does not entitle a petitioner to federal habeas relief.

### 6. Appellate Review Neglects Inquiry Into Influence Of Passion, Prejudice

Here, Hartman contends that Ohio's scheme fails to adequately insure against random and arbitrary imposition of the death sentence. With this claim, Hartman is not entirely clear regarding what makes the scheme random and arbitrary. As previously discussed, to the extent Hartman's claim is a criticism of Ohio's proportionality review, the claim fails. *See Pulley,* 465 U.S. at 50–51, 104 S.Ct. 871.

Alternatively, Hartman may be arguing that Ohio's scheme is unconstitutional because it does not provide a check on a prosecutor's discretion to decide whether to seek a capital indictment. The Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), rejected such an argument under a similar death penalty statute that allowed the discretionary system.

### 7. Mandatory Death Sentence

Hartman argues further that the Ohio death penalty scheme is unconstitutional because it is impermissibly mandatory. He says that by foreclosing the sentencing body's authority to return a life sentence unless aggravating factors fail to outweigh the mitigating factors, Ohio's statutes violate the Constitution by creating a mandatory death penalty. Hartman additionally asserts that Ohio's death penalty scheme is unconstitutional for not requiring an instruction on the jury's ability to show mercy in the absence of any mitigating evidence or when the aggravating circumstances outweigh the mitigating factors.

▆ Ohio law, however, does not provide for the automatic imposition of the death penalty for persons convicted of a particular crime. Rather, Ohio's sentencing scheme merely allows for the imposition of the death penalty when the aggravating circumstances of a particular crime outweigh any mitigating factors. This approach does not offend the Constitution. *See Buell,* 274 F.3d at 368 (upholding the

imposition of the death penalty when a jury and the reviewing courts specifically considered the aggravating and mitigating circumstances and finding that "[b]y weighing these specific considerations, it cannot be said that a mandatory death penalty was imposed ...").

■ As for Hartman's mercy argument, Ohio's death penalty scheme does not stop consideration of sympathy and mercy and does not contain an anti-mercy requirement that would make it unconstitutional. *See California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). However, Ohio law does not mandate that the trial court give a mercy instruction. The Court finds no support for the proposition that such an instruction is constitutionally required.

### 8. *Jury Not Permitted To Consider The Appropriateness Of The Sentence*

■ Next, Hartman asserts that Ohio's death penalty scheme is unconstitutional for failing to require the jury to decide the appropriateness of the death penalty. Quite simply, no constitutional provision requires the State to prove that death is the only appropriate punishment. All the Constitution requires, as set forth by the United States Supreme Court, is that the statutory scheme channel the sentencer's discretion and allow the sentencer to consider mitigating evidence. *See Eddings,* 455 U.S. at 110, 102 S.Ct. 869. Ohio's death penalty scheme satisfies these constitutional requirements.

### 9. *Conscious Desire To Kill*

■ Hartman claims that the Ohio death penalty statutory scheme is unconstitutional because it does not require either the conscious desire to kill or premeditation and deliberation as the culpable mental state.

The federal Constitution does not require a premeditated and conscious desire to kill before the imposition of capital punishment. *See Tison v. Arizona,* 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Therefore, the Court rejects this argument.

### 10. *Proof Beyond All Doubt*

Next, Hartman claims for various reasons that Ohio's application of the reasonable doubt standard in capital cases violates the Constitution. Primarily, Hartman argues that the "beyond a reasonable doubt" standard is too lenient and that proof "beyond all doubt" is required.

Hartman offers no case law in support of this argument, nor does the Court find any. In fact, the Sixth Circuit has upheld Ohio's definition of reasonable doubt against constitutional attack in various contexts. *See Thomas v. Arn,* 704 F.2d 865, 869 (6th Cir.1983).

### 11. *Aggravating Circumstance Used To Aggravate Aggravated Murder*

■ Hartman also says that "duplication" of the underlying offense of felony murder as an aggravating circumstance violates the Eighth Amendment. The Supreme Court rejected this claim in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In *Lowenfield,* the jury found an aggravating circumstance that was identical to an element of the underlying offense. The *Lowenfield* Court held that this "duplication" did not violate the Eighth Amendment. It reasoned that the requirement that a capital sentencing scheme narrow the class of persons eligible for the death penalty may be "performed by jury findings at either the sentencing phase of the trial or the guilt phase." *Id.* at 244–45, 108 S.Ct. 546.

Here, the aggravating circumstance that applied to Hartman was that he had committed an aggravated murder while committing kidnapping as proscribed under Ohio Rev.Code § 2929.04(A)(7). This is a legislative narrowing. *Coe v. Bell,* 161 F.3d 320, 350 (6th Cir.1998). Accordingly, this claim is without merit.

### 12. Felony Murderers Treated More Harshly Than Premeditated Murderers

■■■ Hartman contends that Ohio's death penalty statute is unconstitutional as it delegates harsher punishment to the felony murderer than the punishment imposed on the premeditation murderer. The Court finds no support for this argument. *Tison,* 481 U.S. at 158, 107 S.Ct. 1676, stands as authority that the imposition of the death penalty on felony murderers is not constitutionally infirm.

### 13. Burden Of Evidence In Penalty Phase

Hartman argues that Ohio's statutory scheme impermissibly reduces the State's burden of proof to a preponderance of the evidence in the penalty phase. Hartman contends that the State should have the burden of proving the absence of mitigating factors beyond a reasonable doubt.

The Court finds the claim fails. The United States Supreme Court has upheld a jury instruction that required the state to prove only that the aggravating circumstances outweighed the mitigating factors. *Boyde v. California,* 494 U.S. 370, 377, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). Like that statute, under Ohio Rev.Code § 2929.03(D), the State has the burden of proving that the aggravating circumstances outweigh the mitigating factors.

### K. PROPORTIONALITY REVIEW

With his final claim, Hartman again contends that the Ohio death penalty statute fails to provide a fair and meaningful proportionality review on appeal. Specifically addressing this argument, the Sixth Circuit recently found no constitutional infirmity in Ohio appellate courts' proportionality review. *See Smith v. Mitchell,* 348 F.3d 177, 214 (6th Cir.2003). The Sixth Circuit noted that the Constitution does not require comparative proportionality review. *Id.* (citing *Pulley,* 465 U.S. at 50, 104 S.Ct. 871). Additionally, the Sixth Circuit observed that it had previously rejected arguments that Ohio's proportionality review was unconstitutional. *Id.* (citing *Buell,* 274 F.3d at 368–69; *Byrd,* 209 F.3d at 539; *Coe,* 161 F.3d at 351–52). Based on binding Sixth Circuit law on this issue, the Court finds the claim to be without merit.

### IV. CONCLUSION

The Court concludes that Hartman's claims do not warrant the relief sought and DENIES Hartman's petition.

IT IS SO ORDERED.